IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

RHONDA BERNABY, INDIVIDUALLY AND
AS NEXT FRIEND AND GUARDIAN OF BABY A.B.

      Plaintiffs,

|  | MDL No. 2804 |
|---|---|
|  | Judge Dan Aaron Polster |
| v. | CASE NO. _____ |

MCKESSON CORPORATION;
CARDINAL HEALTH, INC.;                        JURY TRIAL DEMANDED
AMERISOURCEBERGEN CORPORATION;
TEVA PHARMACEUTICAL INDUSTRIES, LTD.;
TEVA PHARMACEUTICALS USA, INC.;
CEPHALON, INC.
MYLAN PHARMACEUTICALS, INC.;
JOHNSON & JOHNSON;
JANSSEN PHARMACEUTICALS, INC.;
ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. n/k/a JANSSEN
PHARMACEUTICALS, INC.;
JANSSEN PHARMACEUTICA INC. n/k/a JANSSEN PHARMACEUTICALS, INC.;
ENDO HEALTH SOLUTIONS INC.;
ENDO PHARMACEUTICALS, INC.;
ALLERGAN PLC f/k/a ACTAVIS PLC;
WATSON PHARMACEUTICALS, INC. n/k/a ACTAVIS, INC.;
WATSON LABORATORIES, INC.;
ACTAVIS LLC; and
ACTAVIS PHARMA, INC. f/k/a WATSON PHARMA, INC.,
PAR PHARMACEUTICAL, INC.;
PAR PHARMACEUTICAL COMPANIES, INC.;
NORAMCO, INC.;
INDIVIOR, INC.;
CVS HEALTH CORPORATION;
RITE AID OF MARYLAND, INC.;
RITE AID CORP.;
WALGREENS BOOTS ALLIANCE, INC.;
WALGREEN EASTERN CO.;
WALGREEN CO.;
WAL-MART INC. f/k/a WALMART STORES, INC.;
MIAMI-LUKEN, INC.;
COSTCO WHOLESALE CORPORATION;
H.D. SMITH, LLC;
H.D. SMITH HOLDINGS, LLC;

**H.D. SMITH HOLDING COMPANY;**
**ANDA, INC.**

    **Defendants**

## COMPLAINT

    **NOW COME** Plaintiff Rhonda Bernaby as the next friend and guardian of Baby A.B., and hereby file their Complaint against the Defendants for damages.  In support thereof, Plaintiffs state as follows:

## INTRODUCTION

    1.    Like thousands of children born every year, Baby A.B. was born dependent on opioids. Prenatal exposure to opioids causes severe withdrawal symptoms and lasting developmental and teratogenic impacts.  The first days of Baby A.B.'s life were spent in excruciating pain as doctors weaned the infant from opioid addiction. Baby Plaintiffs will require years of treatment and counseling to deal with the effects of prenatal exposure.

    2.    Baby A.B. and her mother are victims of the opioid crisis that has ravaged California, causing immense suffering to those born addicted to opioids and great expense to those forced to deal with the aftermath.

    3.    At birth, Baby A.B. was each diagnosed with Neonatal Abstinence Syndrome ("NAS"),[1] arising from her mother's dependence, oftentimes an addiction, upon opioids. Upon information and belief, Baby A.B. was forced to endure a painful start to their lives: crying excessively, arching their backs, refusing to feed, and shaking uncontrollably. NAS is a clinical diagnosis and best described as "a consequence of the abrupt discontinuation of chronic fetal exposure to substances

---

[1] The term "NAS" is defined to include additional, but medically-symptomatic identical, terminology and diagnostic criteria, including Neonatal Opioid Withdrawal Syndrome (NOWS) and other historically and regionally used medical and/or hospital diagnostic criteria for infants born addicted to opioids from in utero exposure.

that were used or abused by the mother during pregnancy."[2] Upon information and belief, Baby A.B. spent her first days in a Neonatal Intensive Care Unit ("NICU") writhing in agony as they endured detoxification and withdrawals from powerful opioids. Upon information and belief, Baby A.B. underwent Opioid Replacement Therapy to wean the newborn from its involuntary addiction. Such treatment, while medically necessary to save the child's life and lessen its suffering, prolong the negative health outcomes associated with their respective mother's ingestion of opioids.

4.      Upon information and belief, Baby A.B.'s mother was prescribed Defendants' opioids prior to their gestation, resulting in their mothers' opioid addictions and Baby A.B.'s opioid exposure during gestation.

5.      Baby A.B.'s mothers consumed opioids manufactured and distributed by one or more of the named defendants, including:

a.  Purdue's products Oxycontin, Dilaudid, and MS Contin;

b.  Cephalon's products Actiq and Fentora;

c.  Janssen's product Duragesic;

d.  Endo's products Percodan, Percocset, Opana, Opana ER, Oxycodone, Hydrocodone (Vicodin and Lortab), Oxymorphone, and Hydromorphone; and

e.  Actaivis' product Norco and Kadian.

6.      Plaintiffs' experiences are part of an opioid epidemic sweeping through the United States, including California, that has caused thousands of infants great suffering and continuing developmental issues.  This epidemic is the largest health care crisis in U.S. history.

7.      At all relevant times, the Manufacturer Defendants manufactured, packaged, distributed, supplied, sold, placed into the stream of commerce, labeled, described, marketed,

[2] Prabhakar Kocherlakota, *Neonatal Abstinence Syndrome,* 134(2) Pediatrics 547, 547-48 (2014), *available at* http://pediatrics.aappublications.org/content/pediatrics/134/2/e547.full.pdf.

advertised, promoted, and purported to accurately represent the benefits and risks associated with the use of the prescription opioid drugs.  The net result of this behavior was to flood the market with highly addictive, dangerous opioids, whether through the primary prescription market (including to females of child-bearing age) and the secondary market.  At all times, the Manufacturer Defendants have manufactured and sold prescription opioids without fulfilling their legal duty to prevent diversion and report suspicious orders.  But for the dereliction of this legal duty, the robust secondary market for opioids could not have existed.

## PARTIES

### A.   Plaintiffs

8.      Baby A.B. has suffered from NAS as a result of exposure to opioids in utero. This drug exposure provides Plaintiffs the right to sue, through their next friends and guardians. This drug exposure provides Baby Plaintiffs the right to sue, through their next friends and guardians, for equitable and injunctive relief under public nuisance and civil conspiracy.

9.      Rhonda Bernaby is a resident of Simi Vally, CA. She is the legal guardian of Baby A.B., who was born on October 4, 2014 at Tampa General Hospital in Tampa, FL in Hilsborough County, and upon information and belief spent time in the NICU after being diagnosed with NAS. Baby A.B. was exposed in utero due to his birth mother's consumption of opioids.

### B.   Defendants

*Distributor Defendants*

10.      McKesson Corporation ("**McKesson**") has its principal place of business in Irving, TX and is incorporated under the laws of Delaware.  During all relevant times, McKesson has distributed substantial amounts of prescription opioids to providers and retailers in the State of California.  As a distributor in California, McKesson Corporation held less than 19% (or 2,537,317,832

Total Dosage Units) of the Total Dosage Units ("TDU") market share and less than 20% (or 23,435,594,902 Morphine Milligram Equivalent) of the Morphine Milligram Equivalent ("MME") market share from 2006 to 2014.

11.     Cardinal Health, Inc. ("**Cardinal**") has its principal place of business in Ohio and is incorporated under the laws of Ohio.  During all relevant times, Cardinal has distributed substantial amounts of prescription opioids to providers and retailers in the State of California. As a distributor in California, Cardinal Health held 10% (or 1,379,492,3352 TDU) of the TDU market share and 20% (or 18,065,340,322 MME) of the MME market share from 2006 to 2014, giving them the largest MME and TDU market share of any distributor in California during this time period.

12.     AmerisourceBergen Corporation ("**AmerisourceBergen**") has its principal place of business in Pennsylvania and is incorporated under the laws of Delaware. During all relevant times, AmerisourceBergen has distributed substantial amounts of prescription opioids to providers and retailers in the State of California. As 2,947,854,104 a distributor in California AmerisourceBergen Corporation held 22% (or 2,947,854,104 TDU) of the TDU market share and 21% (or 24,996,231,709 MME) of the MME market share from 2006 to 2014.

13.     Defendant CVS Health Corporation ("**CVS**") is a Delaware corporation with its principal place of business in Rhode Island.  CVS, through its various DEA registered subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor.  CVS also operates retail stores in numerous States, including in California, that sell prescription medicines, including opioids. At all times relevant to this Amended Complaint, CVS distributed prescription opioids and engaged in the retail selling of opioids throughout the United States, including in California.

14.     Defendant Rite Aid of Maryland, Inc., dba Rite Aid Mid-Atlantic Customer Support Center, Inc. is a Maryland corporation with its principal offices located in Lutherville Timonium, Maryland. Defendant Rite Aid Corp. is a Delaware corporation with its principal offices located in

Camp Hill, Pennsylvania. Together, Rite Aid of Maryland, Inc. and Rite Aid Corp. are referred to as "**Rite Aid**."

15. Rite Aid, through its various DEA registered subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor. Rite-Aid also operates retail stores, including in California, that sell prescription medicines, including opioids. At all times relevant to this Complaint, Rite Aid, through its various DEA registered subsidiaries and affiliated entities, distributed prescription opioids and engaged in the retail selling of opioids throughout the United States, including in California.

16. Defendant Walgreens Boots Alliance, Inc., is a Delaware corporation with its principal place of business in Illinois. Defendant Walgreen Eastern Co. is a subsidiary of Walgreens Boots Alliance, Inc. that is engaged in the business of distributing pharmaceuticals, including prescription opioids. Defendant Walgreen, Co. is a subsidiary of Walgreens Boots Alliance that operates retail drug stores. Together, Walgreens Boots Alliance, Inc., Walgreen Eastern Co. and Walgreen Co. are referred to as "**Walgreens**."

17. Walgreens, through its various DEA registered subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor. At all relevant times, Walgreens has sold and continues to sell prescription opioids in close proximity to the hospitals, clinics, and other healthcare facilities serving the state of California.

18. Defendant Wal-Mart Inc. f/k/a Walmart Stores, Inc. ("**Wal-Mart**"), is a Delaware corporation with its principal place of business in Bentonville, Arkansas. Walmart, through its various DEA registered affiliated entities, conducts business as a licensed wholesale distributor. At all times relevant to this Amended Complaint, Wal-Mart distributed prescription opioids and engaged in the retail selling of opioids throughout the United States, including in California.

19. Defendant MIAMI-LUKEN, INC. ("**Miami-Luken**") is an Ohio corporation with

its principal place of business located in Springboro, Ohio. During all relevant times, Miami-Luken has distributed substantial amounts of prescription opioids to providers and retailers in California.

20. Defendant COSTCO WHOLESALE CORPORATION ("**Costco**") is a Washington corporation with its principal place of business in Issaqua, Washington. During all relevant times, Costco has sold and continues to sell, in California and nationwide, prescription opioids including the Opioid Drugs at issue in this lawsuit.

21. Defendants H. D. Smith, LLC d/b/a HD Smith f/k/a H. D. Smith Wholesale Drug Co., H. D. Smith Holdings, LLC, H. D. Smith Holding Company ("**H. D. Smith**") is a Delaware corporation with its principal place of business in Springfield, Illinois. H. D. Smith is a privately held independent pharmaceuticals distributor of wholesale brand, generic, and specialty pharmaceuticals. At all times relevant to this Complaint, H. D. Smith distributed prescription opioids throughout the United States, including California. As a distributor in Caifornia, H.D. Smith held 2% (or 331,371,649 TDU) of the TDU market share  and 2% (or 2,452,767,364 MME) of the MME market share from 2006 to 2014.

22. Defendant Anda, Inc. ("**Anda**"), is a Florida corporation with its principal office located in Olive Branch, Mississippi. Through its various DEA registrant subsidiaries and affiliated entities, Anda is the fourth largest distributor of generic pharmaceuticals in the United States. In October 2016, Defendant Teva USA acquired Anda for $500 million in cash. At all relevant times, Anda distributed prescription opioids throughout the United States, including in California. As a distributor in California, Anda, Inc. held 1. % (or 13,391,157,261 TDU) of the TDU market share and 1% (or 1,683,784,527 MME) of the MME market share from 2006 to 2014.

23. McKesson, Cardinal, AmerisourceBergen, CVS, Rite Aid, Walgreens, Wal-Mart, Miami-Luken, Costoco, H.D. Smith, and Anda are collectively referred to hereinafter as "**Distributor Defendants**."

*Pharmaceutical Marketing and Manufacturing Defendants*

24.     Mylan Pharmaceuticals, Inc. ("**Mylan**") is a Delaware corporation with its principal place of business in Canonsburg, Pennsylvania. Mylan manufactures, promotes, sells, and distributes opioids in the U.S. and California. Mylan took advantage of its position in the state of California to profit from the Opioid Crisis there by not only manufacturing and selling opioids to be 13th largest player in the market by Total Dosage Units; Mylan's opioids were powerful enough that when measured by Morphine Milligram Equivalence, Mylan jumps from 13th place to 5th place in the California market. As a labeler in California, Mylan Pharmaceuticals, Inc.  held less than 1% (or 47,037,100 TDU) of the TDU market share and 10% (or 14,219,287,455 MME) of the MME market share from 2006 to 2014.

25.     Cephalon, Inc. ("Cephalon") is a Delaware corporation with its principal place of business in Frazer, Pennsylvania. Cephalon manufactures, promotes, sells, and distributes opioids such as Actiq and Fentora in the U.S. and California. Actiq and Fentora have been approved by the FDA only for the "management of breakthrough cancer pain in patients 16 years of age and older who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain." In 2008, Cephalon pled guilty to a criminal violation of the Federal Food, Drug and Cosmetic Act for its misleading promotion of Actiq and two other drugs and agreed to pay $425 million. As a labeler in California, Cephalon, Inc. held less than 1% (or 7,622,874 TDU) of the TDU market share and 1% (or 799188029 MME) of the MME market share from 2006 to 2014.

26.     Teva Pharmaceutical Industries, Ltd. ("Teva Ltd.") is an Israeli corporation with its principal place of business in Petah Tikva, Israel. Teva Pharmaceuticals USA, Inc. ("Teva USA") is a wholly- owned subsidiary of Teva Ltd. and is a Delaware corporation with its principal place of business in Pennsylvania.  Teva USA acquired Cephalon in October 2011. As a labeler in California,

Teva Pharmaceuticals USA, Inc. held 3% (or 320,511,872 TDU) of the TDU market share and 3% (or 4,634,189,314 MME) of the MME market share from 2006 to 2014.

27.     Teva Ltd., Teva USA, and Cephalon collaborate to market and sell Cephalon products in the U.S. Teva Ltd. conducts all sales and marketing activities for Cephalon in the U.S. through Teva USA.  Teva Ltd. and Teva USA publicize Actiq and Fentora as Teva products. Teva USA sells all former Cephalon branded products through its "specialty medicines" division.  The FDA-approved prescribing information and medication guide, which is distributed with Cephalon opioids marketed and sold in California, discloses that the guide was submitted by Teva USA, and directs physicians to contact Teva USA to report adverse events. Teva Ltd. has directed Cephalon to disclose that it is a wholly-owned subsidiary of Teva Ltd. on prescription savings cards distributed in California, indicating Teva Ltd. would be responsible for covering certain co-pay costs.  All of Cephalon's promotional websites, including those for Actiq and Fentora, prominently display Teva Ltd.'s logo. Teva Ltd.'s financial reports list Cephalon's and Teva USA's sales as its own.  Through interrelated operations like these, Teva Ltd. operates in California and the rest of the U.S. through its subsidiaries Cephalon and Teva USA. The U.S. is the largest of Teva Ltd.'s global markets, representing 53% of its global revenue in 2015, and, were it not for the existence of Teva USA and Cephalon, Inc., Teva Ltd. would conduct those companies' business in California itself. Upon information and belief, Teva Ltd. directs the business practices of Cephalon and Teva USA, and their profits inure to the benefit of Teva Ltd. as controlling shareholder. (Teva Ltd., Teva USA, and Cephalon, Inc. are hereinafter collectively referred to as "**Cephalon**.")

28.     Janssen Pharmaceuticals, Inc. is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey, and is a wholly owned subsidiary of Johnson & Johnson (J&J), a New Jersey corporation with its principal place of business in New Brunswick, New Jersey.  Ortho-McNeil-Janssen Pharmaceuticals, Inc., now known as Janssen Pharmaceuticals, Inc., is a Pennsylvania

corporation with its principal place of business in Titusville, New Jersey.  Janssen Pharmaceuticals Inc., now known as Janssen Pharmaceuticals, Inc., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey. J&J is the only company that owns more than 10% of Janssen Pharmaceuticals' stock, and corresponds with the FDA regarding Janssen's products. Upon information and belief, J&J controls the sale and development of Janssen Pharmaceuticals' drugs and Janssen's profits inure to J&J's benefit.  (Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., Janssen Pharmaceutica, Inc., and J&J hereinafter are collectively referred to as "**Janssen**."). Janssen manufactures, promotes, sells, and distributes drugs in the U.S. and California, including the opioid Duragesic, a fentanyl transdermal patch. Before 2009, Duragesic accounted for at least $1 billion in annual sales.  Until January 2015, Janssen developed, marketed, and sold the opioids Nucynta and Nucynta ER. Together, Nucynta and Nucynta ER accounted for $172 million in sales in 2014.  As a labeler in California, Janssen Pharmaceuticals, Inc. held less than 1% (or 29,862,664 TDU) of the TDU market share and  3% (or 4,121,996,853 MME) of the MME market share from 2006 to 2014.

29.     Defendant Noramco, Inc. ("**Noramco**") is a Delaware company headquartered in Wilmington, Delaware and was a wholly owned subsidiary of J&J and its manufacturer of active pharmaceutical ingredients until July 2016 when J&J sold its interests to SK Capital. Until 2016, Noramco wholly owned Tasmanian Alkaloids, Inc., the largest opium poppy producer in the state of Tasmania, Australia. During Noramco's ownership of Tasmanian Alakloids, Noramco processed and imported Active Pharmaceutical Ingredients ("APIs") necessary for the production of opioid drugs to the United States and sold these APIs to Janssen and various other domestic opioid manufacturers.

30.     Endo Health Solutions Inc. is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. Endo Pharmaceuticals Inc. is a wholly-owned subsidiary of Endo Health Solutions Inc. and is a Delaware corporation with its principal place of business in Malvern,

Pennsylvania. (Endo Health Solutions Inc. and Endo Pharmaceuticals Inc. hereinafter are collectively referred to as "**Endo**.") Endo develops, markets, and sells prescription drugs, including the opioids Opana/Opana ER, Percodan, Percocet, and Zydone, in the U.S. and California. Opioids made up roughly $403 million of Endo's overall revenues of $3 billion in 2012. Opana ER yielded $1.15 billion in revenue from 2010 and 2013, and it accounted for 10% of Endo's total revenue in 2012. Endo also manufactures and sells generic opioids such as oxycodone, oxymorphone, hydromorphone, and hydrocodone products in the U.S. and California, by itself and through its subsidiary, Qualitest Pharmaceuticals, Inc. As a labeler in California, Endo Pharmaceuticals, Inc. held 1% (or 54,142,408 TDU) of the TDU market share  and 2% (or 2,248,363,801 MME) of the MME market share from 2006 to 2014.

31.    Allergan PLC is a public limited company incorporated in Ireland with its principal place of business in Dublin, Ireland. Actavis PLC acquired Allergan PLC in March 2015, and the combined company changed its name to Allergan PLC in January 2013. Before that, Watson Pharmaceuticals, Inc. acquired Actavis, Inc. in October 2012, and the combined company changed its name to Actavis, Inc. as of January 2013, later to Actavis PLC in October 2013. Watson Laboratories, Inc. is a Nevada corporation with its principal place of business in Corona, California, and is a wholly-owned subsidiary of Allergan PLC (f/k/a Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc.). Actavis Pharma, Inc. (f/k/a Actavis, Inc.) is a Delaware corporation with its principal place of business in New Jersey and was formerly known as Watson Pharma, Inc. Actavis LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey. Each of these defendants is owned by Allergan PLC, which uses them to market and sell its drugs in California. Upon information and belief, Allergan PLC exercises control over and derives financial benefit from the marketing, sales, and profits of Allergan/Actavis products. (Allergan PLC, Actavis PLC, Actavis, Inc., Actavis LLC, Actavis Pharma, Inc., Watson Pharmaceuticals, Inc., Watson Pharma, Inc., and

Watson Laboratories, Inc. hereinafter are referred to collectively as "**Actavis**.") Actavis manufactures, promotes, sells, and distributes opioids, including the branded drugs Kadian and Norco, a generic version of Kadian, and generic versions of Duragesic and Opana, in California. Actavis acquired the rights to Kadian from King Pharmaceuticals, Inc. on December 30, 2008, and began marketing Kadian in 2009.

32.    Defendant Par Pharmaceutical, Inc. is a New York corporation with its principal place of business located in Chestnut Ridge, New York. Par Pharmaceutical, Inc. is a wholly-owned subsidiary of Par Pharmaceutical Companies, Inc. f/k/a Par Pharmaceutical Holdings, Inc. Defendant Par Pharmaceuticals Companies, Inc. is a Delaware corporation with its principal place of business located in Chestnut Ridge, New York (Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc. are referred to collectively as "**Par Pharmaceutical**"). Par Pharmaceutical is an affiliate of Defendants Endo Health Solutions Inc. ("EHS") and Endo Pharmaceuticals, Inc. ("EPI). EHS, EPI, and Par Pharmaceutical, and their DEA registrant subsidiaries and affiliates (collectively, "Endo"), manufacture opioids sold throughout the United States including in California. As a labeler in California, Endo Pharmaceuticals, Inc. held 1% (or 54,142,408 TDU) of the TDU market share  and 2% (or 2,248,363,801 MME) of the MME market share from 2006 to 2014..

33.    Defendant Indivior, Inc. ("**Indivior**") is a Delaware domestic corporation with its principal place of business in Richmond, Virginia.  Indivior manufactures and distributes buprenorphine-based prescription drugs for treatment of opioid dependence. Buprenorphine is a Schedule III drug.  The company offers medication under the brand name Suboxone and sublingual tablets under the brand name Subutex. Indivior, Inc. is a subsidiary of Indivior, PLC, based in the United Kingdom.  Indivior, Inc. was formerly known as Reckitt Benckiser Pharmaceuticals, Inc. Indivior, Inc. has manufactured and/or labeled Buprenorphine shipped to California.

34.    Mylan, Cephalon, Janssen, Endo, Actavis, Par Pharmaceutical, Noramco, and Indivior

are collectively referred to hereinafter as the "**Pharmaceutical Defendants**" or "**Pharmaceutical Marketing and Manufacturing Defendants**."

## JURISDICTION AND VENUE

35.     This Court is vested with jurisdiction by virtue of the parties' diversity, 28 U.S.C. § 1332. Minimal diversity exists between named Plaintiffs, whose children were born in the State of California, and Defendants.  The typical post birth hospital admission cost for one NAS baby is $180,000 to $250,000. Thus the amount in controversy exceeds $75, 000. Babies afflicted with NAS are born every 15 minutes.

36.     This Court has personal jurisdiction over Defendants, each of which has committed torts, in part or in whole, within the State of California, as alleged herein. Moreover, Defendants have substantial contacts and business dealings directly within California by virtue of their distribution, dispensing, and sales of prescription opioids.

37.     Plaintiffs reserve the right to move for transfer to the US District Court for the Central District of California at the conclusion of pretrial proceedings and assert that California law applies. Plaintiffs rely on CMO 1 that this case will be transferred to the appropriate court, and the appropriate court is the federal Court in Florida.  Plaintiffs would be filing this case there if CMO 1 were not applicable.

## BACKGROUND FACTS

38.     Opioid means "opium – like" and the term includes all drugs derived in whole or in part from the opium poppy.

39.     Opioids or opiates include any of various sedative narcotics containing opium or one or more of its natural or synthetic derivatives.

13

40.     The United States Food and Drug Administration's website describes this class of drugs as follows: "Prescription opioids are powerful pain-reducing medications that include prescription oxycodone, hydrocodone, and morphine, among others, and have both benefits as well as potentially serious risks. These medications can help manage pain when prescribed for the right condition and when used properly. But when misused or abused, they can cause serious harm, including addiction, overdose, and death."

41.     The Controlled Substances Act ("CSA") defines "opiate" or "opioid" as "any drug or other substance having an addiction-forming or addiction-sustaining liability similar to morphine or being capable of conversion into a drug having such addiction-forming or addiction-sustaining ability."

42.     Prescription opioids with the highest potential for addiction are categorized under Schedule II of the CSA.  They include non-synthetic derivatives of the opium poppy (such as codeine and morphine, which are also called "opiates"), partially synthetic derivatives (such as hydrocodone and oxycodone), or fully synthetic derivatives (such as fentanyl and methadone).

43.     Before the epidemic of Defendants' prescription opioids, the generally accepted standard of medical practice was that opioids should only be used short-term for acute pain, pain relating to recovery from surgery, or for cancer or palliative (end-of-life) care.  Due to the lack of evidence that opioids improved patients' ability to overcome pain and function, coupled with evidence of greater pain complaints as patients developed tolerance to opioids over time and the serious risk of addiction and other side effects, the use of opioids for chronic pain was discouraged or prohibited. As a result, doctors generally did not prescribe opioids for chronic pain.

44.     However, the past two decades have been characterized by increased abuse and diversion of prescription drugs, including opioid medications, in the United States.

**The Opioid Epidemic**

14

45.     Prescription opioids have now become widespread.  Opioids are the most-prescribed class of drugs. Globally, opioid sales generated $11 billion in revenue for drug companies in 2010 alone; sales in the United States have exceeded $8 billion in revenue annually since 2009.

46.     By 2010, enough prescription opioids were sold to medicate every adult in the United States with a dose of 5 milligrams of hydrocodone every 4 hours for 1 month.

47.     The increased use of prescription painkillers for nonmedical reasons, along with growing sales, has contributed to a large number of overdoses and deaths.  In 2010, 1 in every 20 people in the United States age 12 and older – a total of 12 million people – reported using prescription painkillers non-medically according to the National Survey on Drug Use and Health.

48.     By 2011, the U.S. Department of Health and Human Resources, Centers for Disease Control and Prevention, ("CDC") declared prescription painkiller overdoses at epidemic levels. Specifically, the CDC reported that the death toll from overdoses of prescription painkillers has more than tripled in the past decade and more than 40 people die every day from overdoses involving narcotic pain relievers like hydrocodone (Vicodin), methadone, oxycodone (OxyContin), and oxymorphone (Opana).

49.     Many Americans are now addicted to prescription opioids, and the number of deaths due to prescription opioid overdose is unacceptable.  The rate of death from opioid overdose has quadrupled during the past 15 years in the United States.  Nonfatal opioid overdoses that require medical care in a hospital or emergency department have increased by a factor of six in the past 15 years.

50.     In 2016, drug overdoses killed roughly 64,000 people in the United States, an increase of more than 22 percent over the 52,404 drug deaths recorded the previous year.

51.     The President of the United States declared an opioid and heroin epidemic the same year.

15

52.     The CDC released a report analyzing opioid-related hospital emergency department data between July 2016 and September 2017 and finding that nearly two thirds (66.4%) of drug overdose deaths in 2016 involved prescription opioids, illicit opioids, or both, an increase of 27.7% from 2015.

53.     Moreover, the CDC has identified addiction to prescription pain medication as the strongest risk factor for heroin addiction.  People who are addicted to prescription opioid painkillers are forty times more likely to be addicted to heroin.

54.     Heroin is pharmacologically similar to prescription opioids.  The majority of current heroin users report having used prescription opioids non-medically before they initiated heroin use. Available data indicates that the nonmedical use of prescription opioids is a strong risk factor for heroin use.

55.     The National Institute on Drug Abuse identifies misuse and addiction to opioids as "a serious national crisis that affects public health as well as social and economic welfare."  The economic burden of prescription opioid misuse alone is $78.5 billion a year, including costs of healthcare, lost productivity, addiction treatment, and criminal justice expenditures.

56.     The epidemic of prescription pain medicine and heroin deaths is devastating families and communities across the country.  Meanwhile, the manufacturers and distributors of prescription opioids extract billions of dollars of revenue from the addicted American public while billions of dollars of injury are caused by the reasonably foreseeable consequences of the prescription opioid addiction epidemic.

57.     The prescription opioid manufacturers and distributors, including the Defendants, have continued their wrongful, intentional, and unlawful conduct, despite their knowledge that such conduct is causing and/or contributing to the national, state, and local opioid epidemic.

**Neonatal Abstinence Syndrome**

16

58.     Many of the victims of the opioid epidemic, and certainly some of the most harmed, are babies born with Neonatal Abstinence Syndrome. NAS babies likely experience DNA changes at the cellular level, particularly in the tissues of the brain and nervous system and suffer lifelong afflictions as a result of maternal use of prescription opioid medications during gestation.  These patients often require extensive care because they are likely to experience lifelong mental health problems and disorders, developmental impairment and cognitive defects, and physical health limitations and disorders.

59.     Recently, there has been a dramatic increase in the number of fetuses that have been exposed to opioids.  Women are also victims of the opioid epidemic, and health care for opioid exposed mothers and their babies is a major factor in the nation's rising unreimbursed healthcare costs.

60.     The number of infants born suffering from this insidious condition is staggering. The incidence of NAS in the United States grew five-fold between 2000 and 2012.  Specifically, cases of NAS increased nationally from a rate of 1.2 per 1000 hospital births per year in 2000 to 5.8 per 1000, with a total of 21,732 infants diagnosed with NAS by 2012.  Currently, the best estimates are that a child with NAS is born as frequently as every 15-25 minutes, depending on the time period referenced.

61.     In 2011, the Substance Abuse Mental Health Services Administration reported that 1.1% of pregnant women abused opioids (0.9% used opioid pain relievers and 0.2% used heroin).

62.     In 2014, the number of babies born drug-dependent had increased by 500 percent since 2000, and children being placed in foster care due in part to parental drug abuse are going up — now it is almost one third of all child removals.

63.     Opioid-related cases of NAS are rising at such a rapid pace that cities, counties, and health care systems are unable to keep up logistically.

64.     Heroin and other opioid misuse during pregnancy are also associated with increased

risks and incidence of placental abruption, preterm labor, maternal obstetric complications, maternal mortality, and fetal death. The opioid crisis caused by Defendants served to fuel an epidemic of heroin use.

65.      NAS-diagnosed children are at increased risk for neuropsychological function. The challenges presented to them and their caregivers at birth can be summarized as: "Do they catch up, remain at a disadvantage, or proceed to function even more poorly than their peers over time?" Unfortunately, research arising from the Opioid Epidemic reveals that all children exposed to opioids and other drugs *in utero* are at a substantially higher risk for lower mental abilities and more signs of attention deficits, and that these effects will persist or worsen through adolescence.

66.      Specifically, children diagnosed with NAS exhibit:

•by age 1: diminished performance on the Psychomotor Development Index, growth retardation, poor fine motor skills, short attention span, diminished intellectual performance;

•between ages 2-3: significantly lower cognitive abilities, including lower motor development, lower IQ, and poor language development;

•between ages 3-6: significant detrimental impact on self-regulation, including aggressiveness, hyperactivity, lack of concentration, lack of social inhibition, lower IQs (8-15 point difference), poor language development, and behavioral and school problems; and

•after 8.5 years: significantly greater difference in cognitive scores than at previous ages, especially in girls.

67.      While the specific pathophysiological mechanism of opioid withdrawal in neonates is currently not known, several factors can affect the accumulation of opioids in the fetus.  Opiate drugs have low molecular weights, are water soluble, and are lipophilic substances; hence, they are easily transferable across the placenta to the fetus.  The transmission of opioids across the placenta increases as gestation increases and synthetic opiates cross the placenta more easily than semisynthetic opiates.

NAS is the end result of the sudden discontinuation of prolonged fetal exposure to opioids.

68.     NAS babies' mothers either directly purchase and consume prescription opioids from one or more Defendants in the primary market, or indirectly (but foreseeably) obtain them from other sources in the diversionary or secondary market. Each minor child suffers, and faces an increased risk of lifelong mental illness, mental impairment, and loss of mental capacity. The minor child's entire health, use of body and mind,  and life, including the minor child's ability to live normally, learn and work normally, enjoy relationships with others, and function as a valuable citizen, child, parent, income-earner, and person enjoying life, are at risk of being compromised and permanently impaired.

69.     Neonatal exposure to opioids necessarily results in medical needs that exist throughout the entire period of the adolescent development of the Plaintiffs. These needs absolutely exist for any child who had to be weaned from these substances. These needs relate primarily to the well-known adverse effect of opioids on behavioral and regulatory development in exposed children.

70.      In a study from Florida, the number of newborns who had NAS and were admitted to the NICU increased by 10-fold from 2005 to 2011.  Increases in the incidence of NAS have been reported uniformly across community hospitals, teaching hospitals, and children's hospitals.[3]

71.     The NAS epidemic and its consequences could have been, and should have been, prevented by the Defendants who control the U.S. drug distribution industry and the Defendants who manufacture the prescription opioids.  These Defendants have profited greatly by allowing California to become flooded with prescription opioids.

72.     The drug distribution industry is supposed to serve as a "check" in the drug delivery system, by securing and monitoring opioids at every step of the stream of commerce, protecting them from theft and misuse, and refusing to fulfill suspicious or unusual orders by downstream pharmacies,

---

[3] Prabhakar Kocherlakota, *Neonatal Abstinence Syndrome*, 134(2) Pediatrics 547, 547-48 (2014), *available at* http://pediatrics.aappublications.org/content/pediatrics/134/2/e547.full.pdf.

doctors, clinics, or patients. Defendants woefully failed in this duty, instead consciously ignoring known or knowable problems and data in their supply chains.

73.     Defendants thus intentionally and negligently created conditions in which vast amounts of opioids have flowed freely from drug manufacturers to innocent patients who became addicted, to opioid abusers, and even to illicit drug dealers - with distributors regularly fulfilling suspicious orders from pharmacies and clinics, who were economically incentivized to ignore "red flags" at the point of sale and before dispensing the pills.

74.     Defendants' wrongful conduct has allowed billions of opioid pills to be diverted from legitimate channels of distribution into the illicit black market in quantities that have fueled the opioid epidemic in California.  This is characterized as "opioid diversion" and created a secondary market. Acting against their common law and statutory duties, Defendants have created an environment in which opioid diversion is rampant.  As a result, unknowing patients and unauthorized opioid users have ready access to illicit sources of diverted opioids.

75.     For years, Defendants and their agents have had the ability to substantially reduce the consequences of opioid diversion, including the dramatic increase in the number of infants born with NAS. All the Defendants in this action share responsibility for perpetuating the epidemic and the exponential increase in the number of infants afflicted with NAS.

76.     Defendants have foreseeably caused damages to Plaintiffs including the costs of neo-natal medical care, additional therapeutic, prescription drug purchases and other treatments for NAS afflicted newborns, and counseling and rehabilitation services after birth and into the future.  Plaintiffs bring this civil action seeking the aforementioned relief and any other relief allowed by law against the Defendant opioid drug distributors  and manufacturers that, by their actions and omissions, knowingly or negligently have distributed and dispensed prescription opioid drugs in a manner that foreseeably damaged, and continues to damage Plaintiffs.

## DEFENDANTS' MISREPRESENTATION OF THE RISK OF SERIOUS
## LATENT DISEASE TO THOSE EXPOSED TO OPIOIDS IN UTERO

77. By definition the Plaintiffs have sustained an exposure to opioids greater than that expected by members of the general population. As part of the anticipated claims process, each Plaintiffs will be required to show medical records evidencing exposure to opioids.

78. The neonatal abstinence syndrome (NAS) is a generalized multi-system disorder that produces a constellation of symptoms in neonates, and results from abrupt discontinuation of opioids consumed by the mother during pregnancy at the infant's birth.

79. All infants born to mothers with opioid use disorders are at high risk for developing NAS and babies exposed in utero to opioids are 40% more likely to have injury than babies not so exposed.

80. Opioids represent a single class of exposures since they all cause their effects at the same receptors which are those that mediate the effects of endogenous opiates.

81. Opioids represent a single class of chemical substances since their molecular structures are very similar.

82. Opioids have typical pharmacological effects which are common to the group: effects on the brain, the nervous system and the gastrointestinal system.

83. The opioid compounds all act at the same biological receptors and mimic natural peptides which have powerful and wide-ranging activity in living systems. Thus, they can be considered a class of chemical drugs both in terms of their pharmacological dosage activity relationships and also their overall chemical structure. They all produce addiction and dependence and cause withdrawal symptoms on removal. Their activity as modulators of neurological signaling make them especially dangerous in adults due to rebound effects but also they are now known to have significant effects on fetal development since they alter the cellular signaling environment.

21

84.     The effect of all opioids is produced through a single common pathway – the opioid receptor. The opioid receptor system is ancient and highly conserved, being present by the time that jawed vertebrates first appeared at least 450 million years ago. Clearly, differences between opioid products and potency exist but their mode of action via the opioid receptor system remains identical.

85.     Fetal development relies on the balanced control of cell proliferation and cell death through apoptosis (otherwise termed 'programmed cell death').

86.     It has been demonstrated scientifically that exposure to opiates will  increase the rate of apoptotic cell death in developing biological systems. This represents a common mode of action which leads to the large plethora of adverse conditions associated with fetal opioid exposure, including – sub-optimal brain maturation, a form of functional teratogenesis associated with reduced cognitive function

87.     Perturbed apoptosis is also a contributory factor in gross fetal malformations. These include mid-line fusion defects such as cleft palate, spina bifida and gastroschesis postnatally.

88.     Apoptosis is also essential for normal heart development. The heart develops from a single tube into a four-chamber heart through a series of complex foldings. Such foldings are produced by cellular proliferation on one side of a tube accompanied by apoptosis on the other side, the assymetric growth rates thus producing folding. It is clear to see that the mechanism of altered apoptosis rates leads to malformations.

89.     Supportive measures are the standard of care, and pharmacotherapy is often initiated to treat their inability to sleep, lack of weight gain, inadequate caloric intake, extreme irritability, seizures and hypertonicity. If a neonate is treated with an opioid, the drug withdrawal has to be gradually tapered as the infant regains the capacity for self-regulation.

90.     Buprenorphine and methadone are the most commonly used agents for opioid

replacement therapy.

91.     Upon information and belief, the agents used in Opioid Replacement Therapy are manufactured and distributed by the Defendants thereby creating a revenue stream not only from addicting adults who obtained opioids from the street or through a prescription but also creating a revenue stream for Defendants by treating the babies born  addicted to opioids.

92.     Although a widely-accepted treatment, Opioid Replacement Therapy in neonates is associated with a plethora of negative health impacts including but not limited to reduced brain and somatic growth, intractable nystagmus, altered visual evoked potentials, delayed encephalopathy, respiratory depression, bradycardia, hypotension, urinary retention, reduced gut motility and emesis.

93.     Specifically, the widely-used Opioid Replacement Therapy agent, Buprenorphine, has been associated with extremely poor outcome in children up to the age of 3 to whom the drug was prescribed including congenital heart disease, urinary collecting system defects, ophthalmic defects and maxillofacial defects.

94.     Major risks from prenatal opioid exposure include birth defects, altered brain development and NAS. NAS can cause latent defects to the muscular-skeletal system, the digestive system, the cardio-vascular system and the nervous system.

95.     Evidence that opioids behaved as they were predicted to and caused major birth defects appeared in the results of the National Birth Defect Prevention Study published in 2010. The study looked at 17,449 cases and 6701 controls. Statistically Significant effects were found for associations between early pregnancy maternal opioid analgesic treatment and certain birth defects, notably heart defects, anencephaly, cleft palate and spina bifida.

96.     Long-term cognitive development is impaired in children born with NAS. Further, those children face a significantly increased risk of mental, speech/language and emotional disorders.

97.     Children born with NAS face increased risk of falling prey to the disease of addiction.

98.     These known risks create a need in the NAS population for medical monitoring.

99.     While much is known about the risks of serious latent disease faced by children born with NAS who underwent opioid replacement therapy, recent animal studies have revealed evidence indicating association with additional negative health outcomes:

  a.  increased incidence of neural tube defects

  b.  severe heart defects

  c.  spina bifida

  d.  impaired nerve mylenation

  e.  reduced regional brain volumes in the basal ganglia

100.     The aforementioned risks of serious latent negative health impacts were published, widely-available, but not disclosed, or even mentioned, in the Pharmaceutical Defendants' marketing materials, package inserts, label warnings, unbranded research, captive advocacy group communications, FDA applications, FDA filings or any other means of communication. This information was also available to the Distributor Defendants.

101.     The Defendants purposely misrepresented that there were no teratogenic or mutagenic effect associated with the use of opioids to increase their profits.

102.     The Defendants purposely misrepresented the potential of opioids to result in the negative health impacts described above.

## OPIOID MARKETS

103.     Defendants' pathway to maximizing profits were constrained by the amount of medically necessary opioids that could be sold through controlled channels.  The stark reality Defendants faced in terms of maximizing profits was that  they could only sell so many prescription

opioids to dying cancer patients.  "The logic was simple: While the number of cancer patients was not likely to increase drastically from one year to the next, if a company could expand the indications for use of a particular drug, then it could boost sales exponentially without any real change in the country's health demography."  And, without a new and robust primary market, there would be no supply for the secondary "spill-over" diversionary market that they intended.

104.    Once exposed, users of the opioids could easily transition into the secondary market, which was necessarily supplied from the primary market, and which Defendants were legally charged with insuring there was no supply for. Soon, the demand from the secondary market was further driving prescriptions written for the primary market.

105.    Thus began the Pharmaceutical Manufacturer and Marketing Defendants' quest to open a new primary market for opioid prescriptions: treatment of (a) chronic, (b) widespread pain (c) without dose limits. And, their "ace in the hole" was this: not only could they convince physicians to write prescriptions into this new market, they could ensure through the insidious mechanism of addiction that patients, including California women of child-bearing age, would have to keep coming back for more. With the insidious power to create both unlimited supply and unlimited demand for these highly-addictive substances, the Pharmaceutical Defendants set out to create the new primary market.  Each of the elements of the new primary market were selected to maximize sales of the highly addictive drugs.  Pharmaceutical Defendants were the architects of  the transition from a limited market pool of disease and injury (i.e., cancer, disorders requiring surgery, etc.) to widespread use to treat an ever-enlarging pool of  common, non-life threatening, maladies and conditions, such as arthritis, back pain, and joint pain.  Thus, the universe of targeted patient conditions could be vastly expanded by Pharmaceutical  Defendants.

106.    Next up was the Pharmaceutical Defendants' successful promotion of highly addictive opioids for chronic, i.e., long-term conditions; this step was critical to ensuring that the

newly targeted patient conditions would not result in one-time sales.

107. Finally, to ensure even further sales growth and profits, the Pharmaceutical Defendants promoted the notion that there were no dose limits and, indeed, that patients who appeared to be addicted were actually patients who should be given even more and higher dosages for opioids.

108. In order to maximize profits, the Pharmaceutical Defendants collectively had to convince physicians to expand treatment of their patients to include chronic and "non-malignant", i.e., non-cancer, pain. And, the Pharmaceutical Defendants engaged in this activity despite the fact that the benefits of opioids are minimal in comparison to known risks, which are extreme even fatal. Prospective, randomized, controlled trials lasting at least 4 weeks that evaluated the use of opioids for chronic non-cancer-related pain showed only a negligible to modest improvement in pain-relief and no consistent improvement in physical functioning. The maximal adverse risks, however, are a witches' brew known to include a "high incidence of opioid abuse behaviors" and "addiction."

109. The market innovator that "inspired" all other Pharmaceutical Defendants to follow was Purdue[4], the maker of OxyContin. And, it was not pharmacological innovation in which it led but marketing innovation.

> i. Arthur Sackler [the founder of Purdue, along with his two younger brothers Mortimer and Raymond] thriv[ed] … in the fledgling field of pharmaceutical advertising. It was here that he would leave his greatest mark. As a member of … a small New York-based advertising firm, Sackler expanded the possibilities of medical advertising by promoting products in medical journals and experimenting with televisions and radio marketing. Perhaps his greatest

---

[4] Bankruptcy protection has been sought by former Defendants to this action Purdue Pharma, L.P., Purdue Pharma, Inc., and The Purdue Frederick Company. While Plaintiffs are pursuing creditor relief in that proceeding against those parties, a discussion of the Purdue entities is helpful to understanding both the concert of action and unified scheme waged by the entire industry, especially given that Purdue was a "leader" and "early adopter" of so many nefarious activities that were replicated by Defendants.

Other persons/entities related to unnamed co-conspirator Purdue include Richard S. Sackler, Jonathon D. Sackler, Mortimer D.A. Sackler, Kathe A. Sackler, Ilene Sackler Lefcourt, Beverly Sackler, Theresa Sackler, David A. Sackler, Rhodes Technologies, Rhodes Technologies Inc., Rhodes Pharmaceuticals Inc., Trust for the Benefit of Members of the Raymond Sackler Family, and The P.F. Laboratories, Inc.

achievement, detailed in his biography in the Medical Advertising Hall of Fame, was finding enough different uses for Valium to turn it into the first drug to hit $100 million in revenue.

ii.  (…)

iii.  Sackler was also among the first medical advertisers to foster relationships with doctors in the hopes of earning extra points for his company's drugs, according to a 2011 expose in *Fortune*.  Such backscratching in the hopes of reciprocity is now the model for the whole drug marketing industry.

iv.  Starting in 1996, Purdue Pharma expanded its sales department to coincide with the debut of its new drug.…  Purdue increased its number of sales representatives from 318 in 1996 to 371 in 2000.  By 2001, when OxyContin was hitting its stride, these sales reps received annual bonuses averaging over $70,000, with some bonuses nearing a quarter of a million dollars.  In that year, Purdue Pharma spent $200 million marketing its golden goose.

v.  Boots on the ground was not the only stratagem employed by Purdue to increase sales for OxyContin.  Long before the rise of big data, Purdue was compiling profiles of doctors and their prescribing habits into databases.

vi.  (…)

vii.  Between physician databases, incentive-happy sales reps, and an aggressive blitz package of promotional ephmerea, Purdue's multifaceted marketing campaign pushed OxyContin out of the niche offices of oncologists and pain specialists and into the primary care bazaar, where prescriptions for the drug could be handed out to millions upon millions of Americans.  The most scathing irony is that what allowed OxyContin to reach so many households and communities was the claim that it wasn't dangerous.[5]

110.    Concurrent with the innovative marketing techniques of Purdue, were the efforts of the entire industry to secure a highly potent and stable supply of the active pharmaceutical ingredient (API) in opioids. Upon information and belief, Janssen actively conspired with other pharmaceutical manufacturer and distributor defendants to significantly increase the supply of powerful opioid drugs in the market, thereby exacerbating the opioid epidemic.  *See* Findings of Fact No. 6 through 15, Judgement After Non-Jury Trial in Oklahoma v. Johnson & Johnson, Case No. CJ-2017-816.  In

---

[5]    Mike Mariani, "How the American Opiate Epidemic Was Started by One Pharmaceutical Company," *Pacific Standard*, March 4, 2015.

a quest to dominate the growing opioid market, J&J grew poppies in Tasmania, Australia, and imported and sold APIs derived from these poppies necessary for the manufacture of opioid drugs to other manufacturer defendants. *See* Findings of Fact No.9 through 11, Judgement After Non-Jury Trial in Oklahoma v. Johnson & Johnson, Case No. CJ-2017-816

111.     The Pharmaceutical and Distributor Defendants had an absolute and non-delegable duty to ensure that a supply of controlled substances for a secondary market did not exist.  To be clear, the diversion and misuse of controlled substances is a known high-risk factor with significant negative consequences for families, communities, and even entire states.  When a manufacturer or distributor who wants to deal in controlled substances registers with the DEA, they must take on a duty to prevent the known negative health effects of their addictive products.

112.     In the case of prescription opiates, not only did Defendants wholly fail in that duty, but they intentionally endeavored to flood the primary market with such an excess of drugs that they either knew, or consciously and willfully disregarded the fact, that this would result in misuse and diversion into a secondary market.

113.     Flooding an entire country with this many highly addictive opiates did not occur by accident.  Instead, it occurred as the result of a highly coordinated, expensive, misleading, illegal, and callous manipulation of both the sales and distribution schemes for controlled substances within the United States.

**ARCOS DATA ON DEFENDANT MARKETSHARE IN** California

114.     As a distributor in California, McKesson Corporation held 19% (or 2,537,317,832 TDU) of the TDU market share and 20% (or 3 23,435,594,902 MME) of the MME market share from 2006 to 2014.

115.     As a distributor in California, Cardinal Health held 10% (or 1,379,492,3352 TDU) of

the TDU market share and 16% (or 18,065,340,322 MME) of the MME market share from 2006 to 2014, giving them the largest MME and TDU market share of any distributor in California during this time period.As a distributor in California AmerisourceBergen Corporation held 22% (or 2,947,854,104 TDU) of the TDU market share and 21% (or 24,996,231,709 MME) of the MME market share from 2006 to 2014.

116.    As a labeler in California, Teva Pharmaceuticals USA, Inc. held 3% (or 320,511,872 TDU) of the TDU market share and 3% (or 4,634,189,314 MME) of the MME market share from 2006 to 2014.

117.    As a labeler in California, Janssen Pharmaceuticals, Inc. held less than 1% (or 29,862,664 TDU) of the TDU market share and  3% (or 4,121,996,853 MME) of the MME market share from 2006 to 2014..

118.    As a labeler in California, Endo Pharmaceuticals, Inc. held 1% (or 54,142,408 TDU) of the TDU market share  and 2% (or 2,248,363,801 MME) of the MME market share from 2006 to 2014.

119.    As a labeler in California, Actavis Pharma, Inc. held 23% (or 2,414,406,916 TDU) of the TDU market share and 19% (or 26,577,010,373 MME) of the MME market share from 2006 to 2014.

120.    As a labeler in California, Par Pharmaceutical, Inc. held 14% (or 1,470,336,483 TDU) of the TDU market share and 11% (or 15,459,646,956 MME) of the MME market share from 2006 to 2014.  As a distributor in California, Par Pharmaceutical, Inc. held less than 1% (or 26,051,390 TDU) of the TDU market share and less than 1% (or 99,585,589 MME) of the MME market share from 2006 to 2014.

121.    As a distributor in Caifornia, H.D. Smith held 2% (or 331,371,649 TDU) of the TDU market share  and 2% (or 2,452,767,364 MME) of the MME market share from 2006 to 2014.

122. As a distributor in California, Anda, Inc. held 1. % (or 13,391,157,261 TDU) of the TDU market share and 1% (or 1,683,784,527 MME) of the MME market share from 2006 to 2014

## PHARMACEUTICAL MARKETING AND MANUFACTURING DEFENDANTS' WRONGFUL CONDUCT

123. As Senator McCaskill aptly recognized:

The opioid epidemic is the direct result of a calculated marketing and sales strategy developed in the 90's, which delivered three simple messages to physicians. First, that chronic pain was severely undertreated in the United States. Second, that opioids were the best tool to address that pain. And third, that opioids could treat pain without risk of serious addiction. As it turns out, these messages were exaggerations at best and outright lies at worst.

124. To establish and exploit the lucrative market of chronic pain patients, each Pharmaceutical Defendant developed a well-funded, sophisticated, and fraudulent marketing and distribution scheme targeted at consumers and physicians. These Defendants used direct marketing, as well as veiled advertising by seemingly independent third parties, to spread misrepresentations about the risks and benefits of long-term opioid use – statements that created the "new" market for prescription opioids, upended the standard medical practice, and benefited other Defendants and opioid manufacturers. These statements were deceptive, false, and unfair.  They were not supported by, and in fact contrary to, the scientific evidence. These statements were also contrary to pronouncements by and guidance from the FDA and CDC based on that evidence.

125. The Pharmaceutical Defendants spread their false, deceptive, and unfair statements by marketing their branded opioids directly to doctors and patients in California.  In fact, they specifically targeted susceptible prescribers and vulnerable patient populations, including those in California. Defendants also deployed seemingly unbiased and independent third parties that they controlled to spread their false, reckless, and/or negligent statements about the risks and benefits of opioids for the treatment of chronic pain throughout geographic areas and patient demographics of California.

126. The Pharmaceutical Defendants' direct and branded advertisements falsely portrayed

the benefits of opioids for chronic pain. For example, Endo distributed and made available on its website www.opana.com, a pamphlet promoting Opana ER with photographs depicting patients with physically demanding jobs, misleadingly implying that the drug would provide long-term pain-relief and functional improvement.

127.    The Pharmaceutical Defendants also promoted the use of opioids for chronic pain through "detailers" – sophisticated and specially trained sales representatives who visited individual doctors and medical staff and fomented small-group speaker programs.  In 2014, for instance, these Defendants spent almost $200 million on "detailing" branded opioids to doctors.

128.    The Pharmaceutical Defendants' misrepresentations deceived doctors and patients about the risks and benefits of long-term opioid use. Studies also reveal that many doctors and patients are not aware of or do not understand these risks and benefits. Indeed, patients often report that they were not warned they might become addicted to opioids prescribed to them. As reported in January 2016, a 2015 survey of more than 1,000 opioid patients found that 4 out of 10 were not told opioids were potentially addictive.

129.    The Pharmaceutical Defendants invited doctors to participate, for payment and other remuneration, on and in speakers' bureaus and programs paid for by these Defendants. These speaker programs were designed to provide incentives for doctors to prescribe opioids, including recognition and compensation for being selected as speakers. These speakers gave the false impression that they were providing unbiased and medically accurate presentations when they were, in fact, presenting a script prepared by these Defendants. On information and belief, these presentations conveyed misleading information, omitted material information, and failed to correct Defendants' prior misrepresentations about the risks and benefits of opioids.

130.    The Pharmaceutical Defendants' detailing to doctors was highly effective in the national proliferation of prescription opioids. Defendants used sophisticated data mining and

intelligence to track and understand the rates of initial prescribing and renewal by individual doctors, allowing specific and individual targeting, customizing, and monitoring of their marketing.

131.    The Pharmaceutical Defendants have had unified marketing plans and strategies from state to state, including California. This unified approach ensures that Defendants' messages were and are consistent and effective across all their marketing efforts.

132.    The Pharmaceutical Defendants negligently marketed opioids in California through unbranded advertising that promoted opioid use generally yet was silent as to any specific opioid. This advertising was ostensibly created and disseminated by independent third parties, but funded, directed, coordinated, edited, and distributed, in part or whole, by these Defendants and their public relations firms and agents.

133.    The Pharmaceutical Defendants used putative third-party, unbranded advertising to avoid regulatory scrutiny as such advertising is not submitted to or reviewed by the FDA. These Defendants used third-party, unbranded advertising to create the false appearance that the negligent messages came from an independent and objective source.

134.    The Pharmaceutical Defendants' negligent unbranded marketing also contradicted their branded materials reviewed by the FDA.

135.    The Pharmaceutical Defendants marketed opioids through a small circle of doctors who were vetted, selected, funded, and promoted by these Defendants because their public positions supported the use of prescription opioids to treat chronic pain. These doctors became known as "key opinion leaders" or "KOLs." These Defendants paid KOLs to serve in a number of doctor-facing and public-facing capacities, all designed to promote a pro-opioid message and to promote the opioid industry pipeline, from manufacture to distribution to retail.

136.    The Pharmaceutical Defendants also entered into and/or benefitted from arrangements with seemingly unbiased and independent organizations or groups that generated

32

treatment guidelines, unbranded materials, and programs promoting chronic opioid therapy, including the American Pain Foundation ("APF"), American Academy of Pain ("AAP"), American Pain Society ("APS"), American Geriatrics Society ("AGS"), the Federation of State Medical Boards ("FSMB"), U.S. Pain Foundation ("USPF"), American Chronic Pain Association ("ACPA"), American Society of Pain Education ("ASPE"), National Pain Foundation ("NPF"), and Pain & Policy Studies Group ("PPSG").

137.    Patient advocacy organizations and professional societies like these play a significant role in shaping health policy debates, setting national guidelines for patient treatment, raising disease awareness, and educating the public.

138.    The Pharmaceutical Defendants collaborated, through the aforementioned organizations and groups, to spread false, reckless, and/or negligent messages about the risks and benefits of long-term opioid therapy.  The relationships between the Pharmaceutical Defendants and these groups is further described below:

139.    APF was the most prominent member of the seemingly independent groups the Pharmaceutical Defendants used and was funded almost exclusively by the Pharmaceutical Defendants, receiving more than $10 million in funding from the Pharmaceutical Defendants between 2007 and the close of its business in May 2012.  APF had multiple contacts and personal relationships with the Pharmaceutical Defendants through its many publishing and educational programs, funded and supported by the Pharmaceutical Defendants.  On information and belief, between 2009 and 2010, APF received more than eighty percent of its operating budget from pharmaceutical industry sources.  By 2011, upon information and belief, APF was entirely dependent on incoming grants from Defendants Cephalon, Endo, and others.

140.    On information and belief, APF was often called upon to provide "patient representatives" for the Pharmaceutical Defendants' promotional activities, including for Janssen's

33

"Let's Talk Pain." APF functioned largely as an advocate for the interests of the Pharmaceutical Defendants, not patients.

141.    APF is also credited with creating the PCF in 2004.  On information and belief, former APF President Will Rowe described the PCF as "a deliberate effort to positively merge the capacities of industry, professional associations, and patient organizations."

142.    Upon information and belief, representatives of the Pharmaceutical Defendants, often at informal meetings at conferences, suggested activities and publications for APF to pursue. APF then submitted grant proposals seeking to fund these activities and publications, knowing that drug companies would support projects conceived as a result of these communications.

143.    In December 2011, a ProPublica investigation found that in 2010, nearly 90% of APF's funding came from the drug and medical device community, including Pharmaceutical Defendants. More specifically, APF received approximately $2.3 million from industry sources out of total income of $2.85 million in 2009. Its budget for 2010 projected receipt of approximately $2.9 million from drug companies, out of total income of approximately $3.5 million.  In May 2012, the U.S. Senate Finance Committee began looking into APF to determine the links, financial and otherwise, between the organization and the manufacturers of opioid painkillers. Within days of being targeted by the Senate investigation, APF's board voted to dissolve the organization "due to irreparable economic circumstances." APF "cease[d] to exist, effective immediately."

144.    The American Academy of Pain Medicine ("AAPM") was another group that had systematic ties and personal relationships with the Pharmaceutical Defendants.  AAPM's corporate council includes Teva and other pharmaceutical companies. AAPM received over $2.2 million in funding since 2009 from opioid manufacturers. AAPM maintained a corporate relations council, whose members paid $25,000 per year (on top of other funding) to participate. The benefits included allowing members to present educational programs at off-site dinner symposia in connection with

34

AAPM's marquee event – its annual meeting held in Palm Springs, California, or other resort locations. AAPM described the annual event as an "exclusive venue" for offering education programs to doctors. Membership in the corporate relations council also allowed drug company executives and marketing staff to meet with AAPM executive committee members in small settings. The Pharmaceutical Defendants were all members of the council and presented deceptive programs to doctors who attended this annual event.

145.    The Pharmaceutical Defendants internally viewed AAPM as "industry friendly," with Defendants' advisors and speakers among its active members. The Pharmaceutical Defendants attended AAPM conferences, funded its CMEs and satellite symposia, and distributed its publications. AAPM conferences heavily emphasized sessions on opioids.

146.    Upon information and belief, representatives of the Pharmaceutical Defendants, often at informal meetings at conferences, suggested activities and publications for AAPM to pursue. AAPM then submitted grant proposals seeking to fund these activities and publications, knowing that drug companies would support projects conceived as a result of these communications.

147.    APS was another group with systematic connections and interpersonal relationships with the Pharmaceutical Defendants. APS was one of the groups investigated by Senators Grassley and Baucus, as evidenced by their May 8, 2012 letter arising out of their investigation of "extensive ties between companies that manufacture and market opioids and non-profit organizations" that "helped created a body of dubious information favoring opioids."

148.    Upon information and belief, representatives of the Pharmaceutical Defendants, often at informal meetings at conferences, suggested activities and publications for APS to pursue. APS then submitted grant proposals seeking to fund these activities and publications, knowing that drug companies would support projects conceived as a result of these communications.

149.    FSMB was another group with systematic connections and interpersonal relationships

35

with the Pharmaceutical Defendants. In addition to the contributions reported in *Fueling an Epidemic*, a June 8, 2012 letter submitted by FSMB to the Senate Finance Committee disclosed substantial payments from the Pharmaceutical Defendants beginning in 1997 and continuing through 2012. Not surprisingly, the FSMB was another one of the groups investigated by Senators Grassley and Baucus, as evidenced by their May 8, 2012 letter arising out of their investigation of "extensive ties between companies that manufacture and market opioids and non-profit organizations" that "helped created a body of dubious information favoring opioids."

150.    USPF was another group with systematic connections and interpersonal relationships with the Pharmaceutical Defendants. The USPF was one of the largest recipients of contributions from the Pharmaceutical Defendants, collecting nearly $3 million in payments between 2012 and 2015 alone. The USPF was also a critical component of the Opioid Marketing Enterprise's lobbying efforts to reduce the limits on over-prescription. USPF advertised its ties to the Pharmaceutical Defendants, listing opioid manufacturers like Pfizer, Teva, Endo, and McNeil (i.e., Janssen) as "Platinum," "Gold," and "Basic" corporate members. Industry groups like AAPM, AAPM, APS, and PhRMA are also members of varying levels in the USPF.

151.    AGS was another group with systematic connections and interpersonal relationships with the Defendants. AGS was a large recipient of contributions from the Pharmaceutical Defendants, including Endo and Janssen. AGS contracted with the Pharmaceutical Defendants to disseminate guidelines regarding the use of opioids for chronic pain in 2002 (The Management of Persistent Pain in Older Persons) and 2009 (Pharmacological Management of Persistent Pain in Older Persons). According to news reports, AGS has received at least $344,000 in funding from opioid manufacturers since 2009. AGS internal discussions in August 2009 reveal that it did not want to receive upfront funding from drug companies, which would suggest drug company influence, but would instead accept commercial support to disseminate pro-opioid publications.

152.     Upon information and belief, representatives of the Pharmaceutical Defendants, often at informal meetings at conferences, suggested activities, lobbying efforts and publications for AGS to pursue. AGS then submitted grant proposals seeking to fund these activities and publications, knowing that drug companies would support projects conceived as a result of these communications.

153.     The U.S. Senate found that the Pharmaceutical Defendants made nearly $9 million worth of contributions to various patient advocacy organizations and professional societies such as those described herein.

154.     The Defendants also had systematic links to and personal relationships with each other through their participation in lobbying groups, trade industry organizations, contractual relationships and continuing coordination of activities, including but not limited to, the Pain Care Forum ("PCF") and the Healthcare Distribution Alliance ("HDA").

155.     The PCF has been described as a coalition of drug makers, trade groups and dozens of non-profit organizations supported by industry funding. The PCF recently became a national news story when it was discovered that lobbyists for members of the PCF, including the Pharmaceutical Defendants, quietly shaped federal and state policies regarding the use of prescription opioids for more than a decade.

156.     PCF members spent over $740 million lobbying in the nation's capital and in all 50 statehouses on an array of issues, including opioid-related measures.

157.     Not surprisingly, each of the Pharmaceutical Defendants who stood to profit from lobbying in favor of prescription opioid use is a member of and/or participant in the PCF.

158.     In 2012, membership and participating organizations in the PCF included the HDA (of which all the Pharmaceutical Defendants are members), Endo, Johnson & Johnson (the parent company of Janssen Pharmaceuticals), and Teva (the parent company of Cephalon).

159.     AAPM, APF, and APS were also members of the PCF.

160. The HDA is an industry trade association for wholesalers and distributors.

161. The benefits of HDA membership included the ability to, among other things, "network one on one with manufacturer executives at HDA's members-only Business and Leadership Conference," "participate on HDA committees, task forces and working groups with peers and trading partners," and "make connections."

162. The HDA also offered multiple conferences, including annual business and leadership conferences through which the Pharmaceutical Defendants had an opportunity to "bring together high-level executives, thought leaders and influential managers . . . to hold strategic business discussions on the most pressing industry issues."

163. The Defendants met regularly through the PCF and HDA.

164. To convince doctors and patients in California that opioids can and should be used to treat chronic pain, these Defendants had to persuade them that long-term opioid use is both safe and helpful. Knowing that they could do so only by misrepresenting the risks and benefits of long-term opioid use to those doctors and patients, these Defendants made claims that were not supported by or were contrary to the scientific evidence and which were contradicted by data.

165. To convince doctors and patients that opioids are safe, the Pharmaceutical Defendants negligently trivialized and failed to disclose the risks of long-term opioid use, particularly the risk of addiction, through a series of misrepresentations that have been conclusively debunked by the FDA and CDC. These misrepresentations – which are described below – reinforced each other and created the dangerously misleading impression that: (a) starting patients on opioids was low- risk because most patients would not become addicted, and because those who were at greatest risk of addiction could be readily identified and managed; (b) patients who displayed signs of addiction probably were not addicted and, in any event, could easily be weaned from the drugs; (c) the use of higher opioid doses, which many patients need to sustain pain relief as they develop tolerance to the drugs, do not pose

special risks; and (d) abuse-deterrent opioids both prevent abuse and overdose and are inherently less addictive. Defendants have not only failed to correct these misrepresentations, but they continue to make them today.

166. The Pharmaceutical Defendants falsely claimed that the risk of opioid addiction is low and that addiction is unlikely to develop when opioids are prescribed (as opposed to obtained illicitly), and failed to disclose the greater risk of addiction with prolonged use of opioids. Some examples of these misrepresentations by opioid manufacturers are:

a. Actavis employed a patient education brochure that claimed opioid addiction is "less likely if you have never had an addiction problem";

b. Cephalon sponsored APF's Treatment Options: A Guide for People Living with Pain, claiming that addiction is rare and limited to extreme cases of unauthorized doses;

c. Endo sponsored a website, Painknowledge.com, which claimed that "[p]eople who take opioids as prescribed usually do not become addicted";

d. Endo distributed a pamphlet with the Endo logo entitled Living with Someone with Chronic Pain, which stated that: "most people do not develop an addiction problem";

e. Janssen distributed a patient education guide entitled Finding Relief: Pain Management for Older Adults which described as "myth" the claim that opioids are addictive;

f. a Janssen website claimed that concerns about opioid addiction are "overestimated";

g. Another Endo website, PainAction.com, stated that "[m]ost chronic pain patients do not become addicted to the opioid medications that are prescribed for

39

them"; and

> h.    Janssen's unbranded website "Prescribe Responsibly" stated that concerns about addiction were "overestimated" and that "true addiction occurs only in a small percentage of patients."

167.    These claims are contrary to longstanding scientific evidence, as the FDA and CDC have conclusively declared. As noted in the 2016 CDC Guideline endorsed by the FDA, there is "extensive evidence" of the "possible harms of opioids (including opioid use disorder [an alternative term for opioid addiction])." The Guideline points out that "[o]pioid pain medication use presents serious risks, including . . . opioid use disorder" and that "continuing opioid therapy for three (3) months substantially increases risk for opioid use disorder."

168.    The FDA further exposed the falsity of the Pharmaceutical Defendants' claims about the low risk of addiction when it announced changes to the labels for certain opioids in 2013 and for other opioids in 2016. In its announcements, the FDA found that "most opioid drugs have 'high potential for abuse'" and that opioids "are associated with a substantial risk of misuse, abuse, NOWS [neonatal opioid withdrawal syndrome], addiction, overdose, and death." According to the FDA, because of the "known serious risks" associated with long-term opioid use, including "risks of addiction, abuse, and misuse, even at recommended doses, and because of the greater risks of overdose and death," opioids should be used only "in patients for whom alternative treatment options" like non-opioid drugs have failed. The FDA further acknowledged that the risk is not limited to patients who seek drugs illicitly; addiction "can occur in patients appropriately prescribed [opioids]."

169.    The Pharmaceutical Defendants negligently instructed doctors and patients that the signs of addiction are actually signs of undertreated pain and should be treated by prescribing more opioids. Defendants called this phenomenon "pseudo-addiction" – a term used by Dr. David Haddox, and Dr. Russell Portenoy, KOLs for Cephalon, Endo, and Janssen. Defendants negligently claimed

that pseudo-addiction was substantiated by scientific evidence.  Some examples of these negligent claims are: (a) Cephalon sponsored Responsible Opioid Prescribing, which taught that behaviors such as "requesting drugs by name," "demanding or manipulative behavior," seeing more than one doctor to obtain opioids, and hoarding, are all signs of pseudo-addiction, rather than true addiction; (b) Janssen sponsored, funded, and edited the Let's Talk Pain website, which in 2009 stated: "pseudo-addiction . . . refers to patient behaviors that may occur when pain is under-treated;" and (c) Endo sponsored a National Initiative on Pain Control (NIPC) CME program titled Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia, which promoted pseudo-addiction by teaching that a patient's aberrant behavior was the result of untreated pain.

170.    The 2016 CDC Guideline rejects the concept of pseudo-addiction, explaining that "[p]atients who do not experience clinically meaningful pain relief early in treatment . . . are unlikely to experience pain relief with longer-term use," and that physicians should reassess "pain and function within 1 month" in order to decide whether to "minimize risks of long-term opioid use by discontinuing opioids" because the patient is "not receiving a clear benefit."

171.    The Pharmaceutical Defendants recklessly and/or negligently instructed doctors and patients that addiction risk screening tools, patient agreements, urine drug screens, and similar strategies were very effective to identify and safely prescribe opioids to even those patients predisposed to addiction. These misrepresentations were reckless because Pharmaceutical Defendants directed them to general practitioners and family doctors who lack the time and expertise to closely manage higher-risk patients on opioids. Pharmaceutical Defendants' misrepresentations were intended to make doctors more comfortable in prescribing opioids.  Some examples of these claims are: (a) an Endo supplement in the Journal of Family Practice emphasized the effectiveness of screening tools to avoid addictions; and (b) Cephalon sponsored a continuing medical education ("CME") resentation offered by Medscape in 2003 entitled Pharmacologic Management of Breakthrough or Incident Pain

that taught that "[c]linicians intimately involved with the treatment of patients with chronic pain recognize that the majority of suffering patients lack interest in substance abuse" and "[t]he concern about patients with chronic pain becoming addicted to opioids during long-term opioid therapy may stem from confusion between physical dependence (tolerance) and psychological dependence (addiction) that manifests as drug abuse".         .

172.    The 2016 CDC Guideline exposes the falsity of these misrepresentations, noting that there are no studies assessing the effectiveness of risk mitigation strategies – such as screening tools, patient contracts, urine drug testing, or pill counts widely believed by doctors to detect and deter abuse – "for improving outcomes related to overdose, addiction, abuse, or misuse." The Guideline emphasizes that available risk screening tools "show insufficient accuracy for classification of patients as at low or high risk for [opioid] abuse or misuse" and counsels that doctors "should not overestimate the ability of these tools to rule out risks from long-term opioid therapy."

173.    To underplay the risk and impact of addiction and make doctors feel more comfortable starting patients on opioids, Pharmaceutical Defendants falsely  claimed that opioid dependence can easily be solved by tapering, that opioid withdrawal was not difficult, and that there were no problems in stopping opioids after long-term use.

174.    Pharmaceutical Defendants negligently minimized the significant symptoms of opioid withdrawal – which, as explained in the 2016 CDC Guideline, include drug cravings, anxiety, insomnia, abdominal pain, vomiting, diarrhea, sweating, tremor, tachycardia (rapid heartbeat), spontaneous abortion and premature labor in pregnant women, and the unmasking of anxiety, depression, and addiction – and grossly understated the difficulty of tapering, particularly after long-term opioid use. The 2016 CDC Guideline recognizes that the duration of opioid use and the dosage of opioids prescribed should be "limit[ed]" to "minimize the need to taper opioids to prevent distressing or unpleasant withdrawal symptoms," because "physical dependence on opioids is an expected

physiologic response in patients exposed to opioids for more than a few days." The Guideline further states that "tapering opioids can be especially challenging after years on high dosages because of physical and psychological dependence" and highlights the difficulties, including the need to carefully identify "a taper slow enough to minimize symptoms and signs of opioid withdrawal" and to "pause[] and restart[]" tapers depending on the patient's response. The CDC also acknowledges the lack of any "high-quality studies comparing the effectiveness of different tapering protocols for use when opioid dosage is reduced or opioids are discontinued."

175.    The Pharmaceutical Defendants negligently claimed that doctors and patients could increase opioid dosages indefinitely without added risk of addiction and other health consequences, and failed to disclose the greater risks to patients at higher dosages. The ability to escalate dosages was critical to Defendants' efforts to market opioids for long-term use to treat chronic pain because, absent this misrepresentation, doctors would have abandoned treatment when patients built up tolerance and lower dosages did not provide pain relief.  For example: (a) an Actavis patient brochure stated - "Over time, your body may become tolerant of your current dose. You may require a dose adjustment to get the right amount of pain relief. This is not addiction;"  (b) Cephalon sponsored APF's Treatment Options: A Guide for People Living with Pain, claiming that some patients need larger doses of opioids, with "no ceiling dose" for appropriate treatment of severe, chronic pain; (c) an Endo website, painknowledge.com, claimed that opioid dosages may be increased until "you are on the right dose of medication for your pain;" (d) an Endo pamphlet Understanding Your Pain: Taking Oral Opioid Analgesics, stated "The dose can be increased. . . . You won't 'run out' of pain relief;" and (e) a Janssen patient education guide Finding Relief: Pain Management for Older Adults listed dosage limitations as "disadvantages" of other pain medicines yet omitted any discussion of risks of increased opioid dosages.

176.    These and other representations  were not true, as now confirmed by the FDA and

CDC. As the CDC explains in its 2016 Guideline, the "[b]enefits of high-dose opioids for chronic pain are not established" while the "risks for serious harms related to opioid therapy increase at higher opioid dosage." More specifically, the CDC explains that "there is now an established body of scientific evidence showing that overdose risk is increased at higher opioid dosages." The CDC states that "there is an increased risk for opioid use disorder, respiratory depression, and death at higher dosages." That is why the CDC advises doctors to "avoid increasing dosages" above 90 morphine milligram equivalents per day.

177.    The 2016 CDC Guideline reinforces earlier findings announced by the FDA. In 2013, the FDA acknowledged "that the available data do suggest a relationship between increasing opioid dose and risk of certain adverse events." For example, the FDA noted that studies "appear to credibly suggest a positive association between high-dose opioid use and the risk of overdose and/or overdose mortality."

178.    This court has found that Plaintiffs have presented sufficient evidence to support a finding that each Pharmaceutical Defendant engaged in misleading marketing activities that resulted in a substantial increase in the supply of prescription opioids and proximately caused harm to Plaintiffs. This court has also found that Plaintiffs in this case have produced evidence upon which a jury could reasonably conclude that each Pharmaceutical Defendant failed to maintain effective controls against diversion, and that these failures were a substantial factor in producing the harm suffered by Plaintiffs. *See* Opinion and Order denying Janssen's Motion for Summary Judgment, Case 1:17-md-02804-DAP, Doc #2567, filed 09/04/2019. *See also* Opinion and Order Regarding Defendants' Summary Judgment Motions on Causation, Case 1:17-md-02804-DAP, Doc #2578, Filed 09/09/2019.

179.    Pharmaceutical Defendants' marketing of the so-called abuse-deterrent properties of some of their opioids created false impressions that these opioids can curb addiction and abuse.

44

Indeed, in a 2014 survey of 1,000 primary care physicians, nearly half reported that they believed abuse-deterrent formulations are inherently less addictive.

180.    Pharmaceutical Defendants have made misleading claims about the ability of their so-called abuse-deterrent opioid formulations to deter abuse. For example, Endo's advertisements for the 2012 reformulation of Opana ER negligently claimed that it was designed to be crush resistant, in a way that suggested it was more difficult to abuse. The FDA warned in a 2013 letter that there was no evidence Endo's design "would provide a reduction in oral, intranasal or intravenous abuse." Moreover, Endo's own studies, which it failed to disclose, showed that Opana ER could still be ground and chewed.

181.    In a 2016 settlement with the State of New York, Endo agreed not to make statements in New York that Opana ER was "designed to be, or is crush resistant." New York found those statements false and negligent because there was no difference in the ability to extract the narcotic from Opana ER. Similarly, the 2016 CDC Guideline states that "[n]o studies" support the notion that "abuse-deterrent technologies [are] a risk mitigation strategy for deterring or preventing abuse," noting that the technologies – even when they work – "do not prevent opioid abuse through oral intake, the most common route of opioid abuse, and can still be abused by non-oral routes."

182.    These numerous, longstanding misrepresentations minimizing the risks of long-term opioid use persuaded doctors and patients to discount or ignore the true risks. Pharmaceutical Defendants also had to persuade them that there was a significant upside to long-term opioid use. But as the 2016 CDC Guideline makes clear, there is "insufficient evidence to determine the long-term benefits of opioid therapy for chronic pain."  In fact, the CDC found that "[n]o evidence shows a long-term benefit of opioids in pain and function versus no opioids for chronic pain with outcomes examined at least 1 year later (with most placebo-controlled randomized trials ≤ 6 weeks in duration)" and that other treatments were more or equally beneficial and less harmful than long-term opioid use.

The FDA, too, has recognized the lack of evidence to support long-term opioid use. In 2013, the FDA stated that it was "not aware of adequate and well-controlled studies of opioids use longer than 12 weeks." Despite this, Defendants negligently and misleadingly touted the benefits of long-term opioid use and misleadingly suggested that these benefits were supported by scientific evidence. Not only have Defendants failed to correct these false claims, they continue to make them today.

183.    For example, the Pharmaceutical Defendants falsely and recklessly, and/or negligently claimed that long-term opioid use improved patients' function and quality of life, including the following misrepresentations: (a) an Actavis advertisement claimed that the use of Kadian to treat chronic pain would allow patients to return to work, relieve "stress on your body and your mental health," and help patients enjoy their lives; (b) an Endo advertisement claimed that the use of Opana ER for chronic pain would allow patients to perform demanding tasks, portraying seemingly healthy, unimpaired persons; (c) a Janssen patient education guide Finding Relief: Pain Management for Older Adults stated as "a fact" that "opioids may make it easier for people to live normally" such as sleeping peacefully, working, recreating, having sex, walking, and climbing stairs;  (d) Responsible Opioid Prescribing, by Cephalon and Endo, taught that relief of pain by opioids, by itself, improved patients' function; (e) Cephalon sponsored APF's Treatment Options: A Guide for People Living with Pain, which counseled patients that opioids "give [pain patients] a quality of life we deserve"; (f) Endo's NIPC website painknowledge.com claimed that with opioids, "your level of function should improve; you may find you are now able to participate in activities of daily living, such as work and hobbies, that you were not able to enjoy when your pain was worse"; (g) Endo CMEs titled Persistent Pain in the Older Patient claimed that chronic opioid therapy had been "shown to reduce pain and improve depressive symptoms and cognitive functioning"; (h) Janssen sponsored, funded, and edited a website, Let's Talk Pain, in 2009, which featured an interview edited by Janssen claiming that opioids allowed a patient to "continue to function"; and (i) Cephalon's, Endo's, and Janssen's sales representatives

conveyed the message that opioids will improve patient function.

184.    These claims find no support in the scientific literature.  The 2016 CDC Guideline concluded that "there is no good evidence that opioids improve pain or function with long-term use, and . . . complete relief of pain is unlikely."  The CDC reinforced this conclusion throughout its 2016 Guideline:

- "No evidence shows a long-term benefit of opioids in pain and function versus no opioids for chronic pain with outcomes examined at least 1 year later . . ."

- "Although opioids can reduce pain during short-term use, the clinical evidence review found insufficient evidence to determine whether pain relief is sustained and whether function or quality of life improves with long-term opioid therapy."

- "[E]vidence is limited or insufficient for improved pain or function with long-term use of opioids for several chronic pain conditions for which opioids are commonly prescribed, such as low back pain, headache, and fibromyalgia."

185.    The CDC also noted that the risks of addiction and death "can cause distress and inability to fulfill major role obligations." As a matter of common sense (and medical evidence), drugs that can kill patients or commit them to a life of addiction or recovery do not improve their function and quality of life.

186.    The 2016 CDC Guideline was not the first time a federal agency repudiated the Pharmaceutical Defendants' claim that opioids improved function and quality of life.  In 2010, the FDA warned one opioid manufacturer that it was "not aware of substantial evidence or substantial clinical experience demonstrating that the magnitude of the effect of the drug has in alleviating pain, taken together with any drug-related side effects patients may experience . . . results in any overall positive impact on a patient's work, physical and mental functioning, daily activities, or enjoyment of life." In 2008, the FDA sent a warning letter to another opioid manufacturer making it clear "that [the claim that] patients who are treated with the drug experience an improvement in their overall function, social function, and ability to perform daily activities . . . has not been demonstrated by substantial

47

evidence or substantial clinical experience."

187.    The Pharmaceutical Defendants also negligently and misleadingly emphasized or exaggerated the risks of competing products like NSAIDs, so that doctors and patients would look to opioids first for the treatment of chronic pain.  For example, APF's A Policymaker's Guide to Understanding Pain & Its Management, sponsored by Cephalon, warned that risks of NSAIDs increase if "taken for more than a period of months" and (falsely) attributed 10,000 to 20,000 deaths annually to NSAID overdose, with no corresponding warning for opioids.

188.    Once again, these misrepresentations by Defendants contravene pronouncements by and guidance from the FDA and CDC based on the scientific evidence. Indeed, the FDA changed the labels for ER/LA opioids in 2013 and IR opioids in 2016 to state that opioids should only be used as a last resort "in patients for which alternative treatment options" like non-opioid drugs "are inadequate." The 2016 CDC Guideline states that NSAIDs, not opioids, should be the first-line treatment for chronic pain, particularly arthritis and lower back pain.

189.    Each Pharmaceutical Defendant has fraudulently, recklessly, and negligently marketed its opioids on numerous occasions. In addition to the specific representations and misconduct outlined above, Plaintiffs state the following:

*Cephalon*

190.    Cephalon negligently marketed its opioids Actiq and Fentora for chronic pain even though the FDA has expressly limited their use to the treatment of cancer pain in opioid- tolerant individuals. Both Actiq and Fentora are extremely powerful fentanyl-based IR opioids. Neither is approved for or has been shown to be safe or effective for chronic pain. Indeed, the FDA expressly prohibited Cephalon from marketing Actiq for anything but cancer pain, and refused to approve Fentora for the treatment of chronic pain because of the potential harm, including the high risk of "serious and life-threatening adverse events" and abuse – which are greatest in non-cancer patients.

The FDA also issued a Public Health Advisory in 2007 emphasizing that Fentora should only be used for cancer patients who are opioid-tolerant and should not be used for any other conditions, such as migraines, post-operative pain, or pain due to injury.

191.    Despite this, Cephalon conducted and continues to conduct a well-funded campaign to promote Actiq and Fentora for chronic pain and other non-cancer conditions for which it was not approved, appropriate, or safe. As part of this campaign, Cephalon used CMEs, speaker programs, KOLs, journal supplements, and detailing by its sales representatives to give doctors the false impression that Actiq and Fentora are safe and effective for treating non-cancer pain.  For example: (a) Cephalon paid to have a CME it sponsored, *Opioid-Based Management of Persistent and Breakthrough Pain*, published in a supplement of *Pain Medicine News* in 2009, instructing doctors that "clinically, broad classification of pain syndromes as either cancer or noncancer-related has limited utility" and recommended Actiq and Fentora for patients with chronic pain;  (b) Cephalon's sales representatives set up hundreds of speaker programs for doctors, including many non-oncologists, which promoted Actiq and Fentora for the treatment of non-cancer pain; and (c) in December 2011, Cephalon widely disseminated a journal supplement entitled "*Special Report: An Integrated Risk Evaluation and Mitigation Strategy for Fentanyl Buccal Tablet (FENTORA) and Oral Transmucosal Fentanyl Citrate (ACTIQ)*" to *Anesthesiology News*, *Clinical Oncology News*, and *Pain Medicine News* – three publications that are sent to thousands of anesthesiologists and other medical professionals – that openly promotes Fentora for "multiple causes of pain" and not just cancer pain.

192.    Cephalon's marketing gave doctors and patients the false impression that Actiq and Fentora were not only safe and effective for treating chronic pain, but were also approved by the FDA for such uses.

193.    In summary, Defendant Cephalon made and/or disseminated untrue, false and deceptive statements, and concealed material facts in such a way to make their statements deceptive,

including, but not limited to, the following:

a.  Creating, sponsoring, and assisting in the distribution of patient education materials that contained deceptive statements;

b.  Sponsoring and assisting in the distribution of publications that promoted the deceptive concept of pseudo-addiction, even for high-risk patients;

c.  Developing and disseminating scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic, non-cancer pain in conjunction with Cephalon's potent rapid-onset opioids;

d.  Providing needed financial support to pro-opioid pain organizations that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic, non-cancer pain;

e.  Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic, non-cancer pain;

f.  Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of Cephalon's rapid-onset opioids;

g.  Directing its marketing of Cephalon's rapid-onset opioids to a wide range of medical providers, including general practitioners, neurologists, sports medicine specialists, and workers' compensation programs, serving chronic pain patients;

h.  Making deceptive statements concerning the use of Cephalon's opioids to treat chronic, non-cancer pain to prescribers through in-person detailing and speakers' bureau events, when such uses are unapproved and unsafe; and

i.  Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to prescribers through in-person detailing and speakers' bureau events.

***Actavis***

194.    In California and nationwide, Actavis is engaged in the manufacture, promotion, distribution, and sale of opioids such as the branded drugs Kadian and Norco, a generic version of Kadian, and generic versions of Duragesic and Opana.

195.    Actavis acquired the rights to Kadian from King Pharmaceuticals, Inc. on December 30, 2008, and began marketing Kadian in 2009.

196.    Actavis negligently promoted Kadian through its detailers and direct-to-physician marketing. In 2010, an FDA-mandated "Dear Doctor" letter  required Actavis to inform doctors that "Actavis sales representatives distributed . . . promotional materials that . . . omitted and minimized serious risks associated with [Kadian]," including the risk of "[m]isuse, [a]buse, and [d]iversion of [o]pioids" and, specifically, the risk that "[o]pioid[s] have the potential for being abused and are sought by drug abusers and people with addiction disorders and are subject to criminal diversion."

197.    The FDA warned Actavis that "[w]e are not aware of substantial evidence or substantial clinical experience demonstrating that the magnitude of the effect of the drug [Kadian] has in alleviating pain, taken together with any drug-related side effects patients may experience . . . results in any overall positive impact on a patient's work, physical and mental functioning, daily activities, or enjoyment of life."

198.    In summary, Actavis made and/or disseminated deceptive statements, and concealed material facts in such a way to make their statements deceptive, including, but not limited to, the following:

    a.    Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to prescribers through in-person detailing;

    b.    Creating and disseminating advertisements that contained deceptive statements that opioids are safe and effective for the long-term treatment of chronic, non-cancer pain and that opioids improve quality of life;

    c.   Creating and disseminating advertisements that concealed the risk of addiction in the long-term treatment of chronic, non-cancer pain; and

    d.   Developing and disseminating scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic, non-cancer pain and that opioids improve quality of life while concealing contrary data.

**_Endo_**

199.    Endo develops, markets, and sells prescription drugs, including the branded opioids Opana/Opana ER, Percodan, Percocet, and Zydone and generic opioids such as oxycodone, oxymorphone, hydromorphone, and hydrocodone products in the U.S. and California.

200.    Endo misrepresented the benefits of opioids for chronic pain. In addition to the numerous examples of such misrepresentations outlined above, Endo distributed and made available on its website www.opana.com, a pamphlet promoting Opana ER with photographs depicting patients with physically demanding jobs, misleadingly implying that the drug would provide long-term pain-relief and functional improvement.

201.    A CME sponsored by Endo, entitled Persistent Pain in the Older Adult, also claimed that withdrawal symptoms could be avoided by tapering a patient's opioid dose by up to 20% for a few days.

202.    The State of New York, in a 2016 settlement agreement with Endo, found that opioid "use disorders appear to be highly prevalent in chronic pain patients treated with opioids, with up to 40% of chronic pain patients treated in specialty and primary care outpatient centers meeting the clinical criteria for an opioid use disorder." Endo had claimed on its www.opana.com website that "[m]ost healthcare providers who treat patients with pain agree that patients treated with prolonged opioid medicines usually do not become addicted," but the State of New York found no evidence for that statement. Consistent with this, Endo agreed not to "make statements that . . . opioids generally

are non-addictive" or "that most patients who take opioids do not become addicted" in New York. This agreement, however, did not extend to California.

203.    In summary, Defendant Endo made and/or disseminated deceptive statements, and concealed material facts in such a way to make their statements deceptive, including, but not limited to, the following:

a.  Creating, sponsoring, and assisting in the distribution of patient education materials that contained deceptive statements;

b.  Creating and disseminating advertisements that contained deceptive statements concerning the ability of opioids to improve function long-term and concerning the evidence supporting the efficacy of opioids long-term for the treatment of chronic, non-cancer pain;

c.  Creating and disseminating paid advertisement supplements in academic journals promoting chronic opioid therapy as safe and effective for long term use for high risk patients;

d.  Creating and disseminating advertisements that falsely and inaccurately conveyed the impression that Endo's opioids would provide a reduction in oral, intranasal, or intravenous abuse;

e.  Disseminating misleading statements concealing the true risk of addiction and promoting the misleading concept of pseudoaddiction through Endo's own unbranded publications and on internet sites Endo sponsored or operated;

f.  Endorsing, directly distributing, and assisting in the distribution of publications that presented an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs;

g.  Providing needed financial support to pro-opioid pain organizations – including over $5

million to the organization responsible for many of the most egregious misrepresentations – that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic, non-cancer pain;

h.  Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic, non-cancer pain and misrepresented the risks of opioid addiction in this population;

i.  Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic, non-cancer pain;

j.  Developing and disseminating scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic, non-cancer pain and that opioids improve quality of life, while concealing contrary data;

k.  Directly distributing and assisting in the dissemination of literature that contained deceptive statements concerning the use of opioids to treat chronic, non-cancer pain, including the concept of pseudo-addiction;

l.  Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic, non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy; and

m.  Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to prescribers through in-person detailing.

**_Johnson & Johnson Defendants_**

204.  Since at least the mid 1990s, the Johnson & Johnson Defendants (hereinafter referred to "J&J", Johnson & Johnson, Janssen and Normaco, developed, produced marketed, promoted, and sold opioid drugs and the ingredients for opioid drugs across the nation. Although changes in

corporate structure and ownership evolved during the Opioid Crisis, the Johnson & Johnson Defendants independently and in concert contributed to the public nuisance created by their tortious acts.

205.    Noramco was a wholly owned subsidiary of J&J and its manufacturer of active pharmaceutical ingredients until July 2016 when J&J sold its interests to SK Capital. All allegations pertaining to J&J also apply to Noramco. Moreover, Noramco is a Pharmaceutical Defendant, and all allegations against the Pharmaceutical Defendants herein apply equally to Noramco.

206.    Janssen is a wholly owned subsidiary of J&J and its manufacturer of opioid drugs. All allegations pertaining to J&J also apply to Noramco. Moreover, Noramco is a Pharmaceutical Defendant, and all allegations against the Pharmaceutical Defendants herein apply equally to Noramco.

207.    In addition to the numerous specific allegations outlined above, Janssen disseminated deceptive statements, and concealed material facts in such a way to make their statements deceptive, including, but not limited to, the following:

a.  Creating, sponsoring, and assisting in the distribution of patient education materials that contained deceptive statements;

b.  Directly disseminating deceptive statements through internet sites over which Janssen exercised final editorial control and approval stating that opioids are safe and effective for the long-term treatment of chronic, non-cancer pain and that opioids improve quality of life, while concealing contrary data;

c.  Disseminating deceptive statements concealing the true risk of addiction and promoting the deceptive concept of pseudo-addiction through internet sites over which Janssen exercised final editorial control and approval;

d.  Promoting opioids for the treatment of conditions for which Janssen knew, due to the

55

scientific studies it conducted, that opioids were not efficacious and concealing this information;

e. Sponsoring, directly distributing, and assisting in the dissemination of patient education publications over which Janssen exercised final editorial control and approval, which presented an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs;

f. Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic, non-cancer pain and misrepresented the risks of opioid addiction in this population;

g. Targeting the elderly by sponsoring, directly distributing, and assisting in the dissemination of patient education publications targeting this population that contained deceptive statements about the risks of addiction and the adverse effects of opioids, and made false statements that opioids are safe and effective for the long-term treatment of chronic, non-cancer pain and improve quality of life, while concealing contrary data;

h. Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic, non-cancer pain;

i. Directly distributing and assisting in the dissemination of literature written that contained deceptive statements concerning the use of opioids to treat chronic, non-cancer pain, including the concept of pseudo-addiction;

j. Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic, non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy;

k. Targeting veterans by sponsoring and disseminating patient education marketing

materials that contained deceptive statements concerning the use of opioids to treat chronic, non-cancer pain; and

l.   Making deceptive statements concerning the use of opioids to treat chronic, non-cancer pain to prescribers through in-person detailing.

208.    Moreover, as part of its marketing, promotion, and sale of opioid drugs, J&J specifically manufactured and sold opioid drugs through Janssen as part of its pain franchise, including (i) Duragesic transdermal patch made out of the active pharmaceutical ingredient ("API") fentanyl; (ii) Ultram and Ultram Extended Release ("ER") tablets made out of the APIs tramadol and acetaminophen; (iii)Ultracet – tablets made out of the APIs, tramadol and acetaminophen; (iv) Nucynta and Nucynta ER – tablets made out of the API, tapentadol; (v) Tylenol with Codeine-tablets made out of the APIs, acetaminophen and codeine; (vi) Tylox- capsules made out of the APIs acetaminophen and oxycodone. *See* Finding of Fact No.4, Judgement After Non-Jury Trial in Oklahoma v. Johnson & Johnson, Case No. CJ-2017-816.

209.    This court has found that sufficient evidence has been presented in this case to support a finding that Jansen engaged in misleading marketing activities that resulted in a substantial increase in the supply of prescription opioids and proximately caused harm to Plaintiffs. Additionally, this court has found that the record presented so far in this case could allow a jury to reasonably conclude that Janssen's unbranded marketing efforts were a substantial factor in producing the harm alleged by Plaintiffs. Further, this court has found that evidence has been produced upon which a jury could reasonably conclude that Janssen failed to maintain effective controls against diversion, and that these failures were a substantial factor in producing the harm suffered by plaintiffs. *See* Opinion and Order Denying Janssen's Motion for Summary Judgment, Case 1:17-md-02804-DAP,  Doc #2567, filed 09/09/2019.

210.    Dr. Paul Janssen, the founder of Janssen Pharmaceutica, now a subsidiary of J&J,

originally invented fentanyl in the 1950s.  Fentanyl, an extremely powerful opioid, is a major factor in the opioid crisis, related to rising numbers of overdose deaths as well as the increasing prevalence of NAS. *See* Finding of Fact No. 5, Judgement After Non-Jury Trial in Oklahoma v. Johnson & Johnson, Case No. CJ-2017-816.

211.    Janssen's opioid marketing, in its multitude of forms, was false, deceptive, and misleading. These marketing activities targeted both the public at large as well as physicians and the medical community directly. *See* Finding of Fact No. 44, Judgement After Non-Jury Trial in Oklahoma v. Johnson & Johnson, Case No. CJ-2017-816.

212.    Additionally, misinformation from Janssen's direct marketing to doctors influenced the medical community's prescribing practices and perception of the dangers of opioids, and encouraged doctors liberally and aggressively write a higher number of opioid prescriptions. The rapid increase in the prescribing and sale of opioid drugs is directly and causally linked to negative consequences of the opioid epidemic including addiction and overdose deaths as well as rising rates of NAS and children entering the child welfare system.  *See* Findings of Fact No. 53 and 55, Judgement After Non-Jury Trial in Oklahoma v. Johnson & Johnson, Case No. CJ-2017-816.

213.    Upon information and belief, Janssen actively conspired with other pharmaceutical manufacturer and distributor defendants to significantly increase the supply of powerful opioid drugs in the market, thereby exacerbating the opioid epidemic. *See* Findings of Fact No. 6 through 15, Judgement After Non-Jury Trial in Oklahoma v. Johnson & Johnson, Case No. CJ-2017-816.

214.    In a quest to dominate the growing opioid market, J&J grew poppies in Tasmania, Australia and imported and sold APIs derived from these poppies necessary for the manufacture of opioid drugs to other manufacturer defendants. *See* Findings of Fact No.9 through 11, Judgement After Non-Jury Trial in Oklahoma v. Johnson & Johnson, Case No. CJ-2017-816.

215.    Beginning in 1990 and continuing until at least 2016, J&J wholly owned two

subsidiaries, Noramco and Tasmanian Alkaloids Limited ("Tasmanian Alkaloids"), which supplied opioid manufacturers with the raw ingredients necessary to meet the growing demand for powerful opioid drugs as the opioid epidemic increased in severity. *See* Findings of Fact No. 11, Judgement After Non-Jury Trial in Oklahoma v. Johnson & Johnson, Case No. CJ-2017-816.

216.    As the opioid crisis worsened, Tasmanian Alkaloids engaged in the cultivation, breeding, and processing of opium poppy plants into compounds necessary for the production of opioid APIs in Tasmania. These raw ingredients were then imported to the United States by Noramco. *See* Findings of Fact No. 9 through 11, Judgement After Non-Jury Trial in Oklahoma v. Johnson & Johnson, Case No. CJ-2017-816.

217.    Noramco imported the raw ingredients produced by Tasmanian Alkaloids to the United States, processed the raw ingredients into opioid APIs, and sold these APIs to opioid manufacturers. *See* Findings of Fact No. 12, Judgement After Non-Jury Trial in Oklahoma v. Johnson & Johnson, Case No. CJ-2017-816.

218.    Upon information and belief, Johnson & Johnson's activities in the production of raw opioid APIs included the development of the Norman Poppy, a strain of the plant containing high levels of the compound *Thebaine*, which is a critical ingredient for the production of oxycodone, oxymorphone, nalbuphine, naloxone, naltrexone, and buprenorphine.  *See* Finding of Fact No. 14, Judgement After Non-Jury Trial in Oklahoma v. Johnson & Johnson, Case No. CJ-2017-816

219.    Upon information and belief, the high-Thebaine Norman Poppy was patented by Tasmanian Alkaloids in 1994 and "was a transformational technology that enabled the growth of oxycodone". *See* Finding of Fact No. 11, Judgement After Non-Jury Trial in Oklahoma v. Johnson & Johnson, Case No. CJ-2017-816.

220.    Upon information and belief, Noramco sold opioid APIs to various other opioid manufacturers, including Teva and "all seven of the top US generic companies" through "long-term

agreements." *See* Finding of Fact No. 14, Judgement After Non-Jury Trial in Oklahoma v. Johnson & Johnson, Case No. CJ-2017-816

221.    Upon information and belief, by 2016, when J&J transferred Noramco and Tasmanian Alkaloids to a private investment firm, Noramco was one of the nation's top suppliers of opioid APIs. In a 2015 presentation to potential buyers of the company, Noramco was described to potential buyers as the "#1 supplier of Narcotic APIs in the United States, the world's largest market." The same presentation lists Net Trade Sales for several of Noramco's APIs, including $94 million in Oxycodone and $52 million in hydrocodone in 2014 alone.

222.    Upon information and belief, J&J's supplying of raw opioid ingredients enabled manufacturer defendants to meet the growing demand for powerful and dangerous opioid drugs formed in the wake of the pharmaceutical industry's misleading mass marketing of opioid drugs to the medical community and directly to the public. By enabling the large-scale manufacture of these drugs, J&J conspired to create an opioid epidemic, addicting millions of Americans to opioid drugs and significantly increasing instances of NAS in the U.S.

### Par Pharmaceutical

223.    Par Pharmaceutical is an affiliate of Endo, which manufactures opioids sold throughout the United States. All allegations pertaining to Endo also apply to Par Pharmaceutical. Moreover, Par Pharmaceutical is a Pharmaceutical Defendant, and all allegations against the Pharmaceutical Defendants herein apply equally to Par Pharmaceutical.

### Indivior

224.    Indivior manufactures and distributes buprenorphine-based prescription drugs for treatment of opioid dependence. Buprenorphine is a Schedule III drug.  The company offers medication under the brand name Suboxone and sublingual tablets under the brand name Subutex. Indivior has manufactured and/or labeled Buprenorphine shipped to California. Indivior is a

Pharmaceutical Defendant, and all allegations against the Pharmaceutical Defendants herein applyqually to Indivior.

225.    As demonstrated by the allegations above, the Pharmaceutical Defendants, both individually and collectively, made, promoted, and profited from their misrepresentations about the risks and benefits of opioids for chronic pain even though they knew that their misrepresentations were false and negligent. The history of opioids, as well as research and clinical experience over the last 20 years, established that opioids were highly addictive and responsible for a long list of very serious adverse outcomes. The FDA and other regulators warned these Defendants of this, and these Defendants had access to scientific studies, detailed prescription data, and reports of adverse events, including reports of addiction, hospitalization, and deaths – all of which made clear the harms from long-term opioid use and that patients are suffering from addiction, overdoses, and death in alarming numbers.

226.    The Pharmaceutical Defendants' fraudulent, reckless, and negligent marketing scheme caused and continues to cause doctors in California to prescribe opioids for chronic pain conditions such as back pain, headaches, arthritis, and fibromyalgia. Absent these Defendants' negligent marketing scheme, these doctors would not have prescribed as many opioids. These Defendants' negligent marketing scheme also caused and continues to cause patients to purchase and use opioids for their chronic pain believing they are safe and effective.  Absent these Defendants' negligent marketing scheme, fewer patients would be using opioids long-term to treat chronic pain, and those patients using opioids would be using less of them.

227.    The Pharmaceutical Defendants' fraudulent, reckless, and negligent marketing has caused and continues to cause the prescribing and use of opioids to explode. Indeed, this dramatic increase in opioid prescriptions and use corresponds with the dramatic increase in Defendants' spending on their negligent marketing scheme. Defendants' spending on opioid marketing totaled

approximately $91 million in 2000.  By 2011, that spending had tripled to $288 million.

228.    The escalating number of opioid prescriptions written by doctors who were deceived by the Pharmaceutical Defendants' marketing scheme is the cause of a correspondingly dramatic increase in opioid addiction, overdose, and death throughout the U.S. and California. In August 2016, the U.S. Surgeon General published an open letter to be sent to physicians nationwide, enlisting their help in combating this "urgent health crisis" and linking that crisis to negligent marketing. He wrote that the push to aggressively treat pain, and the "devastating" results that followed, had "coincided with heavy marketing to doctors . . . [m]any of [whom] were even taught – incorrectly – that opioids are not addictive when prescribed for legitimate pain."

229.    Scientific evidence demonstrates a strong correlation between opioid prescriptions and opioid abuse.  In a 2016 report, the CDC explained that "[o]pioid pain reliever prescribing has quadrupled since 1999 and has increased in parallel with [opioid] overdoses." Patients receiving prescription opioids for chronic pain account for the majority of overdoses.  For these reasons, the CDC concluded that efforts to rein in the prescribing of opioids for chronic pain are critical "to reverse the epidemic of opioid drug overdose deaths and prevent opioid-related morbidity."

230.    Contrary to the Pharmaceutical Defendants' misrepresentations, most opioid addiction begins with legitimately *prescribed* opioids, and therefore could have been prevented had Defendants' representations to prescribers been truthful. In 2011, 71% of people who abused prescription opioids got them through friends or relatives, not from pill mills, drug dealers or the internet. Numerous doctors and substance abuse counselors note that many of their patients who misuse or abuse opioids started with legitimate prescriptions, confirming the important role that doctors' prescribing habits have played in the opioid epidemic.

231.    The Pharmaceutical Defendants also failed to prevent diversion of the drugs they manufactured, and to monitor, report, and prevent suspicious orders of prescription opioids in

accordance with federal law.

232.     Endo has been cited for its failure to set up an effective system for identifying and reporting suspicious prescribing. In its settlement agreement with Endo, the State of New York found that Endo failed to require sales representatives to report signs of abuse, diversion, and inappropriate prescribing; paid bonuses to sales representatives for detailing prescribers who were subsequently arrested or convicted for illegal prescribing; and failed to prevent sales representatives from visiting prescribers whose suspicious conduct had caused them to be placed on a no-call list.

233.     Moreover, at all times relevant to this Complaint, the Pharmaceutical Defendants took steps to avoid detection of and to fraudulently conceal their negligent marketing and unlawful, unfair, and fraudulent conduct.  For example, the Pharmaceutical Defendants disguised their own role in the negligent marketing of chronic opioid therapy by funding and working through third parties like professional societies and KOLs. These Defendants purposefully hid behind the assumed credibility of these individuals and organizations and relied on them to vouch for the accuracy and integrity of Defendants' false and negligent statements about the risks and benefits of long-term opioid use for chronic pain.

234.     The Pharmaceutical Defendants also never disclosed their role in shaping, editing, and approving the content of information and materials disseminated by these third parties. These Defendants exerted considerable influence on these promotional and "educational" materials in emails, correspondence, and meetings with KOLs, fake independent groups, and public relations companies that were not, and have not yet become, public. For example, painknowledge.org, which is run by the NIPC, did not disclose Endo's involvement. Other Pharmaceutical Defendants, such as Janssen, ran similar websites that masked their own direct role.

235.     Finally, the Pharmaceutical Defendants manipulated their promotional materials and the scientific literature to make it appear that these items were accurate, truthful, and supported by

objective evidence when they were not.  These Defendants distorted the meaning or import of studies they cited and offered them as evidence for propositions the studies did not support. The lack of support for these Defendants' negligent messages was not apparent to medical professionals who relied upon them in making treatment decisions.

236.   Thus, the Pharmaceutical Defendants successfully concealed from the medical community and patients facts sufficient to arouse suspicion of the claims that the Plaintiffs now assert. Plaintiffs did not know of the existence or scope of Defendants' industry-wide fraud and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

## DISTRIBUTOR DEFENDANTS' WRONGFUL CONDUCT

237.   The supply chain for prescription opioids begins with the manufacture and packaging of the pills. The manufacturers then transfer the pills to distribution companies, including Defendants Cardinal, McKesson, and AmerisourceBergen, which together account for 85-90% of all revenues from drug distribution in the United States – an estimated $378.4 billion in 2015. The distributors then supply opioids to pharmacies, doctors, and other healthcare providers, who then dispense the drugs to patients.

238.   Manufacturer Defendants and Distributor Defendants share the responsibility for controlling the availability of prescription opioids.  Opioid "diversion" occurs whenever the supply chain of prescription opioids is broken, and the drugs are transferred from a legitimate channel of distribution or use, to an illegitimate channel of distribution or use.  Diversion can occur at any point in the opioid supply chain.

239.   For example, at the wholesale level of distribution, diversion occurs whenever distributors allow opioids to be lost or stolen in transit, or when distributors fill suspicious orders of opioids from buyers, retailers, or prescribers. Suspicious orders include orders of unusually large size,

orders that are disproportionately large in comparison to the population of a community served by the pharmacy, orders that deviate from a normal pattern, and/or orders of unusual frequency and duration.

240.    Diversion occurs through the use of stolen or forged prescriptions at pharmacies, or the sale of opioids without prescriptions, including patients seeking prescription opioids under false pretenses.

241.    Opioid diversion occurs in the United States at an alarming rate.  In recent years, the number of people who take prescription opioids for non-medical purposes is greater than the number of people who use cocaine, heroin, hallucinogens, and inhalants combined.

242.    Every year, thousands of people in California misuse and abuse opioid pain relievers that can lead to addiction, NAS, overdose and death.

243.    Within the last 20 years, the abuse of prescription narcotic pain relievers has emerged as a public health crisis in the United States.

244.    The dramatic rise in heroin use in recent years is a direct result of prescription opioid diversion. The strongest risk factor for a heroin use disorder is prescription opioid use. In one national study covering the period 2008 to 2010, 77.4% of the participants reported using prescription opioids before initiating heroin use. Another study revealed that 75% of those who began their opioid abuse in the 2000s started with prescription opioid. The CDC has reported that people who are dependent on prescription opioid painkillers are 40 times more likely to become dependent on heroin.

245.    Plaintiffs have been significantly damaged by the effects of the Distributor Defendants' opioid diversion.

246.    Distributor Defendants have a duty to exercise reasonable care under the circumstances. This involves a duty not to create a foreseeable risk of harm to others. Additionally, one who engages in affirmative conduct, and thereafter realizes or should realize that such conduct

65

has created an unreasonable risk of harm to another, is under a duty to exercise reasonable care to prevent the threatened harm.

247.    In addition to having common law duties, the Distributor Defendants are governed by the statutory requirements of the CSA, 21 U.S.C. § 801 et seq. and its implementing regulations. These requirements were enacted to protect society from the harms of drug diversion.   The Distributor Defendants' violations of these requirements show that they failed to meet the relevant standard of conduct that society expects from them. The Distributor Defendants' repeated, unabashed, and prolific violations of these requirements show that they have acted in total reckless disregard.

248.    By violating the CSA, the Distributor Defendants are also liable under the law of California as herein alleged.

249.    The CSA creates a legal framework for the distribution and dispensing of controlled substances. Congress passed the CSA partly out of a concern about "the widespread diversion of [controlled substances] out of legitimate channels into the illegal market."  H.R. Rep. No. 91-1444, 1970 U.S.C.C.A.N. at 4566, 4572.

250.    Accordingly, the CSA acts as a system of checks and balances from the manufacturing level through delivery of the pharmaceutical drug to the patient or ultimate user. Every person or entity that manufactures, distributes, or dispenses opioids must obtain a "registration" with the DEA. Registrants at every level of the supply chain must fulfill their obligations under the CSA, otherwise controlled substances move from the legal to the illicit marketplace, and there is enormous potential for harm to the public.

251.    All opioid distributors are required to maintain effective controls against opioid diversion. They are also required to create and use a system to identify and report downstream suspicious orders of controlled substances to law enforcement. Suspicious orders include orders of

unusual size, orders deviating substantially from the normal pattern, and orders of unusual frequency. To comply with these requirements, distributors must know their customers, report suspicious orders, conduct due diligence, and terminate orders if there are indications of diversion.

252. To prevent unauthorized users from obtaining opioids, the CSA creates a distribution monitoring system for controlled substances, including registration and tracking requirements imposed upon anyone authorized to handle controlled substances. The DEA's Automation of Reports and Consolidation Orders System ("ARCOS") is an automated drug reporting system that records and monitors the flow of Schedule II controlled substances from point of manufacture through commercial distribution channels to point of sale. ARCOS accumulates data on distributors' controlled substances, acquisition transactions, and distribution transactions, which are then summarized into reports used by the DEA to identify any diversion of controlled substances into illicit channels of distribution. Each person or entity that is registered to distribute ARCOS Reportable controlled substances must report acquisition and distribution transactions to the DEA.

253. Acquisition and distribution transaction reports must provide data on each acquisition to inventory (identifying whether it is, e.g., by purchase or transfer, return from a customer, or supply by the Federal Government) and each reduction from inventory (identifying whether it is, e.g., by sale or transfer, theft, destruction or seizure by Government agencies) for each ARCOS Reportable controlled substance. 21 U.S.C. § 827(d) (l); 21 C.F.R. §§ 1304.33(e), (d). Inventory that has been lost or stolen must also be reported separately to the DEA within one business day of discovery of such loss or theft.

254. In addition to filing acquisition/distribution transaction reports, each registrant is required to maintain a complete, accurate, and current record of each substance manufactured, imported, received, sold, delivered, exported, or otherwise disposed of. 21 U.S.C. §§ 827(a)(3), 1304.2l(a), 1304.22(b). It is unlawful for any person to negligently fail to abide by the recordkeeping

and reporting requirements.

255.    To maintain registration, distributors must also maintain effective controls against diversion of controlled substances into other than legitimate medical, scientific and industrial channels. When determining if a distributor has provided effective controls, the DEA Administrator refers to the security requirements set forth in §§ 130 1.72-1301.76 as standards for the physical security controls and operating procedures necessary to prevent diversion. 21 CFR § 1301.71.

256.    For years the Distributor Defendants have known of the problems and consequences of opioid diversion in the supply chain and have committed repeated violations of the laws and regulations of the United States as cited above, consequently making them liable under California law, as alleged herein.

257.    To combat the problem of opioid diversion, the DEA has provided guidance to distributors on the requirements of suspicious order reporting in numerous venues, publications, documents, and final agency actions.  Since 2006, the DEA has conducted one-on-one briefings with distributors regarding their downstream customer sales, due diligence responsibilities, and legal and regulatory responsibilities (including the responsibility to know their customers and report suspicious orders to the DEA).  The DEA provided distributors with data on controlled substance distribution patterns and trends, including data on the volume of orders, frequency of orders, and percentage of controlled vs. non-controlled purchases.  The distributors were given case studies, legal findings against other registrants, and ARCOS profiles of their customers whose previous purchases may have reflected suspicious ordering patterns.  The DEA emphasized the "red flags" distributors should look for to identify potential diversion.

258.    Since 2007, the DEA has hosted no less than five conferences to provide opioid distributors with updated information about diversion trends. The Defendant Distributors attended at least one of these conferences, which allowed for questions and discussions. The DEA has

participated in numerous meetings and events with the legacy Healthcare Distribution Management Association, now the HDA. DEA representatives have provided guidance to the association concerning suspicious order monitoring, and the association has published guidance documents for its members on suspicious order monitoring, reporting requirements, and the diversion of controlled substances.

259.    On September 27, 2006 and December 27, 2007, the DEA Office of Diversion Control sent letters to all registered distributors, including the Distributor Defendants, providing guidance on suspicious order monitoring of controlled substances and the responsibilities and obligations of the registrant to conduct due diligence on controlled substance customers as part of a program to maintain effective controls against diversion.

260.    The September 27, 2006 letter reminded registrants that they were required by law to exercise due diligence to avoid filling orders that could be diverted into the illicit market. The DEA explained that as part of the legal obligation to maintain effective controls against diversion, the distributor was required to exercise due care in confirming the legitimacy of each and every order prior to filling. It also described circumstances that could be indicative of diversion including ordering excessive quantities of a limited variety of controlled substances while ordering few if any other drugs; disproportionate ratio of ordering controlled substances versus non-controlled prescription drugs; the ordering of excessive quantities of a limited variety of controlled substances in combination with lifestyle drugs; and ordering the same controlled substance from multiple distributors. The letter went on to describe what questions should be answered by a customer when attempting to make a determination if the order is indeed suspicious.

261.    On December 27, 2007, the Office of Diversion Control sent a follow-up letter to DEA registrants, including the Distributor Defendants, providing guidance and reinforcing the legal requirements outlined in the September 2006 correspondence. The letter reminded registrants that

suspicious orders must be reported when discovered and monthly transaction reports of excessive purchases did not meet the regulatory criteria for suspicious order reporting. The letter also advised registrants that they must perform an independent analysis of a suspicious order prior to the sale to determine if the controlled substances would likely be diverted, and that filing a suspicious order and then completing the sale does not absolve the registrant from legal responsibility. Finally, the letter directed the registrant community to review a recent DEA action that addressed criteria in determining suspicious orders and their obligation to maintain effective controls against diversion.

262. The HDMA, the Distributor Defendants' own industry group, published Industry Compliance Guidelines titled "Reporting Suspicious Orders and Preventing Diversion of Controlled Substances," emphasizing the critical role of each member of the supply chain in distributing controlled substances.

263. These industry guidelines stated: "At the center of a sophisticated supply chain, distributors are uniquely situated to perform due diligence in order to help support the security of controlled substances they deliver to their customers."

264. Opioid distributors have admitted to the magnitude of the problem and, at least superficially, their legal responsibilities to prevent diversion. They have made statements assuring the public they are supposedly undertaking a duty to curb the opioid epidemic.

265. For example, a Cardinal executive claimed that Cardinal uses "advanced analytics" to monitor its supply chain. He further extolled that Cardinal was being "as effective and efficient as possible in constantly monitoring, identifying, and eliminating any *outside* criminal activity" (emphasis added).

266. McKesson has publicly stated that it has a "best-in-class controlled substance monitoring program to help identify suspicious orders" and claimed it is "deeply passionate about curbing the opioid epidemic in our Country."

70

267.    H.D. Smith has stated publicly that it "operates with stringent protection for our nation's healthcare supply chain. The company works with its upstream manufacturing and downstream pharmacy partners to guard the integrity of the supply chain, and to improve patient outcomes."

268.    These assurances of identifying and eliminating criminal activity and curbing the opioid epidemic, on their face, create a duty for the Distributor Defendants to take reasonable measures to do just that.

269.    In addition to the obligations imposed by law, through their own words, representations, and actions, the Distributor Defendants have voluntarily undertaken a duty to protect the public at large against diversion from their supply chains, and to curb the opioid epidemic. In this voluntary undertaking, the Distributor Defendants have miserably and negligently failed.

270.    The Distributors Defendants have knowingly or negligently allowed diversion. Their wrongful conduct and inaction have resulted in numerous civil fines and other penalties recovered by state and federal agencies, including actions by the DEA related to violations of the CSA.

271.    In 2008, Cardinal paid a $34 million penalty to settle allegations about opioid diversion taking place at seven of its warehouses in the United States.  In 2012, Cardinal reached an administrative settlement with the DEA relating to opioid diversion between 2009 and 2012 in multiple states.  In December 2016, a Department of Justice press release announced a multi-million dollar settlement with Cardinal for violations of the CSA. In connection with the investigations of Cardinal, the DEA uncovered evidence that Cardinal's own investigator warned Cardinal against selling opioids to certain pharmacies.

272.    In May 2008, McKesson entered into a settlement with the DEA on claims that McKesson failed to maintain effective controls against diversion of controlled substances. McKesson allegedly failed to report suspicious orders from rogue Internet pharmacies around the country,

resulting in millions of doses of controlled substances being diverted. McKesson agreed to pay a $13.25 million civil fine. McKesson also was supposed to implement tougher controls regarding opioid diversion. McKesson utterly failed. McKesson's system for detecting "suspicious orders" from pharmacies was so ineffective and dysfunctional that at one of its facilities in Colorado between 2008 and 2013, it filled more than 1.6 million orders, for tens of millions of controlled substances, but it reported just 16 orders as suspicious, all from a single consumer.  In 2015, McKesson was in the middle of allegations concerning its "suspicious order reporting practices for controlled substances." In early 2017, it was reported that McKesson agreed to pay $150 million to the government to settle certain opioid diversion claims that it allowed drug diversion at 12 distribution centers in 11 states.

273.    In 2007, AmerisourceBergen lost its license to send controlled substances from a distribution center amid allegations that it was not controlling shipments of prescription opioids to Internet pharmacies. Again in 2012, AmerisourceBergen was implicated for failing to protect against diversion of controlled substances into non-medically necessary channels. It has been reported that the U.S. Department of Justice has subpoenaed AmerisourceBergen for documents in connection with a grand jury proceeding seeking information on the company's "program for controlling and monitoring diversion of controlled substances into channels other than for legitimate medical, scientific and industrial purposes."

274.    Data provided to the U.S. House of Representatives Committee on Energy and Commerce showed that, between 2007 and 2008, H. D. Smith provided two pharmacies in Williamson, California, a town with a population of 3,191, a combined total of nearly 5 million hydrocodone and oxycodone pills, an amount sufficient to provide approximately 1,565 hydrocodone and oxycodone pills to every man, woman, and child in Williamson.

275.    According to press reports, H. D. Smith distributed approximately 13.7 million hydrocodone and 4.4 million oxycodone pills to West Virginia between 2007 and 2012. Press

accounts further indicate that H.D. Smith did not submit any suspicious order reports to the state of West Virginia for at least a decade.

276.    Relying on state laws and regulation, various state boards of pharmacy have directly disciplined the wholesale distributors of prescription opioids for failure to prevent diversion, a duty recognized under state laws and regulations.

277.    Although distributors, including some Distributor Defendants, have been penalized by law enforcement authorities, these penalties have not changed their conduct. They pay fines as a cost of doing business in an industry that generates billions of dollars in revenue and profit.

278.    The Distributor Defendants have the ability and owe the duty to prevent opioid diversion, which presented a known or foreseeable risk of damage to Plaintiffs.

279.    The Distributor Defendants have supplied massive quantities of prescription opioids in California with the actual or constructive knowledge that the opioids were ultimately being consumed by citizens for non-medical purposes. Many of these shipments should have been stopped or investigated as suspicious orders, but the Distributor Defendants negligently or intentionally failed to do so.

280.    Each Distributor Defendant knew or should have known that the amount of the opioids that it allowed to flow into California was far in excess of what could be consumed for medically-necessary purposes in the relevant communities (especially given that each Distributor Defendant knew it was not the only opioid distributor servicing those communities).

281.    The Distributor Defendants negligently or intentionally failed to adequately control their supply lines to prevent diversion. A reasonably-prudent distributor of Schedule II controlled substances would have anticipated the danger of opioid diversion and protected against it by, for example, taking greater care in hiring, training, and supervising employees; providing greater oversight, security, and control of supply channels; looking more closely at the pharmacists and doctors who

were purchasing large quantities of commonly-abused opioids in amounts greater than the populations in those areas would warrant; investigating demographic or epidemiological facts concerning the increasing demand for narcotic painkillers in California; providing information to pharmacies and retailers about opioid diversion; and in general, simply following applicable statutes, regulations, professional standards, and guidance from government agencies and using a little bit of common sense.

282.    On information and belief, the Distributor Defendants made little to no effort to visit the pharmacies servicing patients and citizens of California to perform due diligence inspections to ensure that the controlled substances the Distributors Defendants had furnished were not being diverted to illegal uses.

283.    On information and belief, the compensation the Distributor Defendants provided to certain of their employees was affected, in part, by the volume of their sales of opioids to pharmacies and other facilities servicing the patients and citizens of California, thus improperly creating incentives that contributed to and exacerbated opioid diversion and the resulting epidemic of opioid abuse.

284.    It was reasonably foreseeable to the Distributor Defendants that their conduct in flooding the consumer market of California with highly-addictive opioids would allow opioids to fall into the hands of children, addicts, criminals, and other unintended users.

285.    It is reasonably foreseeable to the Distributor Defendants that, when unintended users gain access to opioids, tragic preventable injuries will result, including neo-natal addiction and NAS.

286.    The Distributor Defendants knew or should have known that the opioids being diverted from their supply chains would create access to opioids by unauthorized users, which, in turn, perpetuates the cycle of addiction, demand, illegal transactions, economic ruin, and human tragedy.

287.    The Distributor Defendants knew or should have known that a substantial amount of the opioids dispensed to patients and citizens of California were being dispensed based on invalid or

suspicious prescriptions. It is foreseeable that filling suspicious orders for opioids will cause harm to individual pharmacy customers, third-parties, Plaintiffs.

288.    The Distributor Defendants were aware of widespread prescription opioid abuse of persons who would become patients in California, but they nevertheless persisted in a pattern of distributing commonly abused and diverted opioids in geographic areas – and in such quantities, and with such frequency – that they knew or should have known these commonly abused controlled substances were not being prescribed and consumed for legitimate medical purposes.

289.    The Distributor Defendants could and should have taken action that: (a) limited to 7 days the supply of opioids dispensed for certain acute prescriptions; (b) reduced the dispensing of stronger and extended release opioids; (c) enhanced pharmacist counseling for new opioid patients; (d) limited the daily dosage of opioids dispensed based on the strength of the opioid; and (e) required the use of immediate- release formulations of opioids before extended-release opioids are dispensed.

290.    Having knowledge and/or notice of the damages that their conduct had caused to Plaintiffs, the Distributor Defendants failed to take other steps to help curb the damages already incurred by Plaintiffs.  The Distributor Defendants could have: (a) donated medication disposal units to community police departments across the country to ensure unused opioid painkillers are disposed of properly rather than taken by individuals to whom the prescription was not written or otherwise diverted or abused; (b) implemented a program that consists of providing counseling to patients who are receiving an opioid prescription for the first time, such as by discussing the risks of dependence and addiction associated with opioid use and discussing and answering any questions or concerns such patients may have; (c) run public education campaigns in which Costco ran public education programs; (d) limited to 7 days the supply of opioids dispensed for certain acute prescriptions; (e) reduced the dispensing of stronger and extended release opioids; (f) enhanced pharmacist counseling for new opioid patients; (g) limited the daily dosage of opioids dispensed based on the strength of the opioid;

75

and h) required the use of immediate-release formulations of opioids before extended-release opioids are dispensed.

291.    The Distributor Defendants could have and should have implemented these measures at any point in the last 15 years.

292.    If any of the Distributor Defendants adhered to effective controls to guard against diversion, Plaintiffs would have avoided significant damages.

293.    The failure to take action was negligent and did result in significant damages to Plaintiffs.

294.    The Distributor Defendants made substantial profits over the years based on the diversion of opioids affecting California.  Their participation and cooperation in a common enterprise has foreseeably caused damages to Plaintiffs.  The Distributor Defendants knew full well that Plaintiffs would be unjustly forced to bear these injuries and damages.

295.    The Distributor Defendants' intentional distribution of excessive amounts of prescription opioids to communities showed an intentional or reckless disregard for Plaintiffs. Their conduct poses a continuing economic threat to the communities that must deal with ongoing needs of children afflicted with NAS.

296.    Each Distributor Defendant has distributed excessive amounts of prescription opioids. In addition to the misconduct outlined above, Plaintiffs state the following:

*McKesson*

297.    Defendants McKesson, Cardinal and AmerisourceBergen, together account for 85-90% of all revenues from drug distribution in the United States – an estimated $378.4 billion in 2015. The distributors then supply opioids to pharmacies, doctors, and other healthcare providers, who then dispense the drugs to patients.

298.    During all relevant times, McKesson has distributed substantial amounts of

prescription opioids to providers and retailers in the State of California.

299.     McKesson has publicly stated that it has a "best-in-class controlled substance monitoring program to help identify suspicious orders" and claimed it is "deeply passionate about curbing the opioid epidemic in our Country."

300.     However, in May 2008, McKesson entered into a settlement with the DEA on claims that McKesson failed to maintain effective controls against diversion of controlled substances. McKesson allegedly failed to report suspicious orders from rogue Internet pharmacies around the country, resulting in millions of doses of controlled substances being diverted. McKesson agreed to pay a $13.25 million civil fine. McKesson also was supposed to implement tougher controls regarding opioid diversion. McKesson utterly failed. McKesson's system for detecting "suspicious orders" from pharmacies was so ineffective and dysfunctional that at one of its facilities in Colorado between 2008 and 2013, it filled more than 1.6 million orders, for tens of millions of controlled substances, but it reported just 16 orders as suspicious, all from a single consumer.  In 2015, McKesson was in the middle of allegations concerning its "suspicious order reporting practices for controlled substances." In early 2017, it was reported that McKesson agreed to pay $150 million to the government to settle certain opioid diversion claims that it allowed drug diversion at 12 distribution centers in 11 states. Cardinal.

### Cardinal

301.     As a distributor in California, Cardinal Health held 10% (or 1,379,492,3352 TDU) of the TDU market share and 16% (or 18,065,340,322 MME) of the MME market share from 2006 to 2014, giving them the largest MME and TDU market share of any distributor in California during this time period.A Cardinal executive claimed that Cardinal uses "advanced analytics" to monitor its supply chain. He further extolled that Cardinal was being "as effective and efficient as possible in constantly monitoring, identifying, and eliminating any *outside* criminal activity" (emphasis added).

302.     However, in 2008, Cardinal paid a $34 million penalty to settle allegations about opioid diversion taking place at seven of its warehouses in the United States.  In 2012, Cardinal reached an administrative settlement with the DEA relating to opioid diversion between 2009 and 2012 in multiple states.  In December 2016, a Department of Justice press release announced a multi-million dollar settlement with Cardinal for violations of the CSA. In connection with the investigations of Cardinal, the DEA uncovered evidence that Cardinal's own investigator warned Cardinal against selling opioids to certain pharmacies.

Amerisource Bergeron.

### *AmerisourceBergen*

303.     During all relevant times, AmerisourceBergen has distributed substantial amounts of prescription opioids to providers and retailers in the State of California. As a distributor in California AmerisourceBergen Corporation held 22% (or 2,947,854,104 TDU) of the TDU market share and 21% (or 24,996,231,709 MME) of the MME market share from 2006 to 2014

304.     In 2007, AmerisourceBergen lost its license to send controlled substances from a distribution center amid allegations that it was not controlling shipments of prescription opioids to Internet pharmacies. Again in 2012, AmerisourceBergen was implicated for failing to protect against diversion of controlled substances into non-medically necessary channels. It has been reported that the U.S. Department of Justice has subpoenaed AmerisourceBergen for documents in connection with a grand jury proceeding seeking information on the company's "program for controlling and monitoring diversion of controlled substances into channels other than for legitimate medical, scientific and industrial purposes."

*305.*     The manufacturers then transfer the pills to distribution companies, including Defendants Cardinal, McKesson, and AmerisourceBergen, which together account for 85-90% of all revenues from drug distribution in the United States – an estimated $378.4 billion in 2015. The

distributors then supply opioids to pharmacies, doctors, and other healthcare providers, who then dispense the drugs to patients.

### CVS

306.    CVS, through its various DEA registered subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor. CVS also operates retail stores, including in California, that sell prescription medicines, including opioids.  As a distributor in California, CVS held 5% (or 659,995,700 TDU) of the TDU market share and 3% (or 2,923,078,453 MME) of the MME market share from 2006 to 2014.

307.    At all times relevant to this Complaint, CVS distributed prescription opioids and engaged in the retail selling of opioids throughout the United States, including in California.

308.    CVS is one of the largest companies in the world, with annual revenue of more than $150 billion. According to news reports, it manages medications for nearly 90 million customers at 9,700 retail locations.

309.    CVS is a repeat offender and recidivist: the company has paid fines totaling over $40 million as the result of a series of investigations by the DEA and the United States Department of Justice ("DOJ"). It nonetheless treated these fines as the cost of doing business and has allowed its pharmacies to continue dispensing opioids in quantities significantly higher than any plausible medical need would require, and to continue violating its recordkeeping and dispensing obligations under the CSA.

310.    As recently as July 2017, CVS entered into a $5 million settlement with the U.S. Attorney's Office for the Eastern District of California regarding allegations that its pharmacies failed to keep and maintain accurate records of Schedule II, III, IV, and V controlled substances.

311.    This fine was preceded by numerous others throughout the country.

312.    In February 2016, CVS paid $8 million to settle allegations made by the DEA and the

DOJ that from 2008-2012, CVS stores and pharmacists in Maryland violated their duties under the CSA and filling prescriptions with no legitimate medical purpose.

313.    In October 2016, CVS paid $600,000 to settle allegations by the DOJ that stores in Connecticut failed to maintain proper records in accordance with the CSA.

314.    In September 2016, CVS entered into a $795,000 settlement with the Massachusetts Attorney General wherein CVS agreed to require pharmacy staff to access the state's prescription monitoring program website and review a patient's prescription history before dispensing certain opioid drugs.

315.    In June 2016, CVS agreed to pay the DOJ $3.5 million to resolve allegations that 50 of its stores violated the CSA by filling forged prescriptions for controlled substances—mostly addictive painkillers—more than 500 times between 2011 and 2014.

316.    In August 2015, CVS entered into a $450,000 settlement with the U.S. Attorney's Office for the District of Rhode Island to resolve allegations that several of its Rhode Island stores violated the CSA by filling invalid prescriptions and maintaining deficient records. The United States alleged that CVS retail pharmacies in Rhode Island filled a number of forged prescriptions with invalid DEA numbers, and filled multiple prescriptions written by psychiatric nurse practitioners for hydrocodone, despite the fact that these practitioners were not legally permitted to prescribe that drug. Additionally, the government alleged that CVS had recordkeeping deficiencies.

317.    In May 2015, CVS agreed to pay a $22 million penalty following a DEA investigation that found that employees at two pharmacies in Sanford, Florida, had dispensed prescription opioids, "based on prescriptions that had not been issued for legitimate medical purposes by a health care provider acting in the usual course of professional practice. CVS also acknowledged that its retail pharmacies had a responsibility to dispense only those prescriptions that were issued based on legitimate medical need."

318.    In September 2014, CVS agreed to pay $1.9 million in civil penalties to resolve allegations it filled prescriptions written by a doctor whose controlled-substance registration had expired.

319.    In August 2013, CVS was fined $350,000 by the Oklahoma Pharmacy Board for improperly selling prescription narcotics in at least five locations in the Oklahoma City metropolitan area.

320.    Dating back to 2006, CVS retail pharmacies in Oklahoma and elsewhere intentionally violated the CSA by filling prescriptions signed by prescribers with invalid DEA registration numbers.

321.    CVS has had knowledge and/or notice of the opioid problem since at least 2002.

322.    At any time since CVS had knowledge and/or notice of the opioid problem it could have unilaterally taken steps to curtail and prevent expansion of the problem, but it failed to do so.

323.    In their capacity as wholesale distributors, CVS and its subsidiaries are Distributor Defendants, and all allegations against the Distributor Defendants herein apply equally to CVS. and its subsidiaries are "Distributor Defendants" as used in the existing complaint.  Plaintiffs adopt all allegations and causes of action alleged against the Distributor Defendants in the existing complaint against CVS.

### Rite Aid

324.    Rite Aid, through its various DEA registered subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor. Rite-Aid also operates retail stores, including in Calidornia, that sell prescription medicines, including opioids.

325.    At all times relevant to this Complaint, Rite Aid, through its various DEA registered subsidiaries and affiliated entities, distributed prescription opioids and engaged in the retail selling of opioids throughout the United States, including in California.

326.    With approximately 4,600 stores in 31 states and the District of Columbia, Rite Aid is

the third-largest drug store chain in the United States, with annual revenue of more than $21 billion.

327.    In 2009, as a result of a multi-jurisdictional investigation by the DOJ, Rite Aid and nine of its subsidiaries in eight states were fined $5 million in civil penalties for its violations of the CSA.

328.    The investigation revealed that from 2004 onwards, Rite Aid pharmacies across the country had a pattern of non-compliance with the requirements of the CSA and federal regulations that lead to the diversion of prescription opioids in and around the communities of the Rite Aid pharmacies investigated. Rite Aid also failed to notify the DEA of losses of controlled substances in violation of 21 USC 842(a)(5) and 21 C.F.R1301.76(b).

329.    In their capacity as wholesale distributors, Rite-Aid and its subsidiaries are "Distributor Defendants" as used in the existing complaint. Plaintiffs adopt all allegations and causes of action alleged against the Distributor Defendants in the existing complaint against Rite Aid.

330.    In their capacity as wholesale distributors, Rite Aid and its subsidiaries are Distributor Defendants, and all allegations against the Distributor Defendants herein apply equally to Rite Aid.

**Walgreens**

331.    Walgreens, through its various DEA registered subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor. At all times relevant to this Complaint, Walgreens distributed prescription opioids and engaged in the retail selling of opioids throughout the United States, including in California.  As a distributor in California, Walgreens held 11% (or 1,427,294,650 TDU) of the TDU market share and 13% (or 15,652,073,064 MME) of the MME market share from 2006 to 2014.

332.    Walgreens is the second-largest pharmacy store chain in the United States behind CVS, with annual revenue of more than $118 billion. According to its website, Walgreens operates more than 8,100 retail locations and filled 990 million prescriptions on a 30-day adjusted basis in fiscal year

2017.

333.    Walgreens also has been penalized for serious and flagrant violations of the CSA. Indeed, Walgreens agreed to the largest settlement in DEA history—$80 million—to resolve allegations that it committed an unprecedented number of recordkeeping and dispensing violations of the CSA, including negligently allowing controlled substances such as oxycodone and other prescription opioids to be diverted for abuse and illegal black market sales.

334.    The settlement resolved investigations into and allegations of CSA violations in Florida, New York, Michigan, and Colorado that resulted in the diversion of millions of opioids into illicit channels.

335.    Walgreens' Florida operations at issue in this settlement highlight its egregious conduct regarding diversion of prescription opioids. Walgreens' Florida pharmacies each allegedly ordered more than one million dosage units of oxycodone in 2011—more than ten times the average amount.

336.    They increased their orders over time, in some cases as much as 600% in the space of just two years, including, for example, supplying a town of 3,000 with 285,800 orders of oxycodone in a one-month period. Yet Walgreens corporate officers turned a blind eye to these abuses. In fact, corporate attorneys at Walgreens suggested, in reviewing the legitimacy of prescriptions coming from pain clinics, that "if these are legitimate indicators of inappropriate prescriptions perhaps we should consider not documenting our own potential noncompliance," underscoring Walgreens' attitude that profit outweighed compliance with the CSA or the health of communities.

337.    Defendant Walgreens' settlement with the DEA stemmed from the DEA's investigation into Walgreens' distribution center in Jupiter, Florida, which was responsible for significant opioid diversion in Florida. According to the Order to Show Cause, Defendant Walgreens' corporate headquarters pushed to increase the number of oxycodone sales to Walgreens' Florida

pharmacies, and provided bonuses for pharmacy employees based on number of prescriptions filled at the pharmacy in an effort to increase oxycodone sales. In July 2010, Defendant Walgreens ranked all of its Florida stores by number of oxycodone prescriptions dispensed in June of that year, and found that the highest-ranking store in oxycodone sales sold almost 18 oxycodone prescriptions per day. All of these prescriptions were filled by the Jupiter Center.

338.　Walgreens has also settled with a number of state attorneys general, including West Virginia ($575,000) and Massachusetts ($200,000).

339.　The Massachusetts Attorney General's Medicaid Fraud Division found that, from 2010 through most of 2015, multiple Walgreens stores across the state failed to monitor the opioid use of some Medicaid patients who were considered high-risk.

340.　In January 2017, an investigation by the Massachusetts Attorney General found that some Walgreens pharmacies failed to monitor patients' drug use patterns and didn't use sound professional judgment when dispensing opioids and other controlled substances—despite the context of soaring overdose deaths in Massachusetts. Walgreens agreed to pay $200,000 and follow certain procedures for dispensing opioids.

341.　In their capacity as wholesale distributors, Walgreens and its subsidiaries are Distributor Defendants, and all allegations against the Distributor Defendants herein apply equally to Walgreens.

### *Wal-Mart*

342.　Wal-mart, through its various DEA registered affiliated entities, conducts business as a licensed wholesale distributor. At all times relevant to this Complaint, Wal-Mart distributed prescription opioids throughout the United States including in California.  As a distributor in California, Wal-mart held 3% (or 1,427,294,650 TDU) of the TDU market share and 13% (or 15,652,073,064 MME) of the MME market share from 2006 to 2014.

343.     In its capacity as a wholesale distributor, Wal-Mart is a "Distributor Defendant" as used in the existing complaint.  Plaintiffs adopt all allegations and causes of action alleged against the Distributor Defendants in the existing complaint against Wal-Mart.

344.     In its capacity as a wholesale distributor, Wal-mart is a Distributor Defendant, and all allegations against the Distributor Defendants herein apply equally to Wal-mart.

### Miami-Luken

345.     During all relevant times, upon information and belief, Miami-Luken has distributed substantial amounts of prescription opioids to providers and retailers in California.  As a distributor in California, Miami-Luken held less than 1% (or 18,060 TDU) of the TDU market share and less than 1% (or 102,090 MME) of the MME market share from 2006 to 2014

346.     On November 23, 2015, the DEA issued an Order to Show Cause to begin the process of revoking Miami-Luken's Certificate of DEA Registration.

347.     In its revocation proceeding, the DEA has alleged that Miami-Luken failed to maintain effective controls against diversion of controlled substances and that the company failed to operate a system to disclose suspicious orders of controlled substances when it shipped controlled substances, particularly oxycodone and hydrocodone, to customers in southern Ohio, eastern Kentucky, and southern West Virginia.

348.     In early 2016, Miami-Luken agreed to pay the state of West Virginia $2.5 million to resolve allegations that the company knowingly shipped opioids to West Virginia pharmacies without exercising sufficient monitoring or control.

349.     In its capacity as a wholesale distributor, Miami-Luken is a Distributor Defendant, and all allegations against the Distributor Defendants herein apply equally to Miami-Luken.

### Costco

350.     Costco failed to track and report suspicious sales of its opioid drugs.

351.     Costco is a "registrant" under the federal CSA, 21 C.F.R. §1300.02(b), which defines a registrant as any person who is registered with the DEA under 21 U.S.C. § 823. Section 823, in turn, requires pharmacies dispensing Schedule II controlled substances to register with the DEA.

352.     Contrary to its duties as a registrant, in 2017, Costco Wholesale was fined $11.75 million as a result of a multijurisdictional investigation by the DOJ relating to CSA violations.

353.     According to the investigation, Costco pharmacies filled prescriptions that were incomplete, lacked valid DEA registration numbers or were for substances beyond various doctors' scope of practice. Additionally, the settlement resolves allegations that Costco failed to keep and maintain accurate records for controlled substances at its pharmacies.

354.     Between January 1, 2012 and December 31, 2015, certain Costco pharmacies dispensed controlled substances inconsistent with their compliance obligations under the CSA and its implementing regulations. The violations include: filling prescriptions from practitioners who did not have a valid DEA number, incorrectly recording the practitioner's DEA number, filling prescriptions outside the scope of a practitioner's DEA registration, filling Prescriptions that did not contain all the required information, failing to maintain accurate dispensing records, and failing to maintain records for their central fill locations in Sacramento, California and Everett, Washington.

355.     According to U.S. Attorney Eileen M. Decker: "These are not just administrative or paperwork violations – Costco's failure to have proper controls in place in its pharmacies played a role in prescription drugs reaching the black market…."

356.     Furthermore, Costco could and should have taken action that: (a) limited to 7 days the supply of opioids dispensed for certain acute prescriptions; (b) reduced the dispensing of stronger and extended release opioids; (c) enhanced pharmacist counseling for new opioid patients; (d) limited the daily dosage of opioids dispensed based on the strength of the opioid; and (e) required the use of immediate- release formulations of opioids before extended-release opioids are dispensed.

357.    Having knowledge and/or notice of the damages that Costco's conduct had caused to Plaintiff, Costco failed to take other steps to help curb the damages already incurred by Plaintiff due to Defendants, including Costco, could have: (a) donated medication disposal units to community police departments across the country to ensure unused opioid painkillers are disposed of properly rather than taken by individuals to whom the prescription was not written or otherwise diverted or abused; (b) implemented a program that consists of providing counseling to patients who are receiving an opioid prescription for the first time, such as by discussing the risks of dependence and addiction associated with opioid use and discussing and answering any questions or concerns such patients may have; (c) run public education campaigns in which Costco ran public education programs; (d) limited to 7 days the supply of opioids dispensed for certain acute prescriptions; (e) reduced the dispensing of stronger and extended release opioids; (f) enhanced pharmacist counseling for new opioid patients; (g) limited the daily dosage of opioids dispensed based on the strength of the opioid; and h) required the use of immediate-release formulations of opioids before extended-release opioids are dispensed.

358.    Costco could have and should have implemented these measures at any point in the last 15 years.

359.    And the failure to take such steps that Costco should have taken was negligent and did result in significant damages to Plaintiff.

360.    In its capacity as a wholesale distributor, Costco is a Distributor Defendant, and all allegations against the Distributor Defendants herein apply equally to Costco.

### H.D. Smith

361.    H.D. Smith is a privately held independent pharmaceuticals distributor of wholesale brand, generic, and specialty pharmaceuticals. At all times relevant to this Complaint, H. D. Smith distributed prescription opioids throughout the United States.

362.    H.D. Smith has also routinely been found to have violated its duties to report

suspicious orders and halt suspicious shipments of prescription opioids.   According to a recent letter from the U.S. House of Representatives Committee on Energy and Commerce, data provided to the Committee showed that between 2007 and 2008, H. D. Smith provided two pharmacies in Williamson, WV, a town with a population of 3,191, combined total of nearly 5 million hydrocodone and oxycodone pills - approximately 1,565 hydrocodone and oxycodone pills for every man, woman, and child in Williamson, WV.   According to press reports, H. D. Smith distributed  approximately 13.7 million  hydrocodone  and  4.4  million  oxycodone  pills to West Virginia  between  2007  and 2012.189  Press accounts further indicate that H. D. Smith did not submit any suspicious order reports to the state for at least a decade.   Upon information and belief, H. D. Smith engaged in similar wrongful activities in California.

363.    In its capacity as a wholesale distributor, H.D. Smith is a Distributor Defendant, and all allegations against the Distributor Defendants herein apply equally to H.D. Smith.

*Anda*

364.    Through its various DEA registrant subsidiaries and affiliated entities, Anda is the fourth largest distributor of generic pharmaceuticals in the United States. In October 2016, Defendant Teva Pharmaceuticals USA, Inc. ("Teva") acquired Anda for $500 million in cash. At all times relevant to this Complaint, Anda distributed prescription opioids throughout the United States, including in California.

365.    In its capacity as a wholesale distributor, Anda is a Distributor Defendant, and all allegations against the Distributor Defendants herein apply equally to Anda.

## DISCOVERY RULE AND TOLLING

366.    The Defendants' unfair and deceptive conduct was well concealed, and only recently uncovered through exhaustive investigation and research.   The Defendants deliberately conducted

88

much of their deception through in-person sales visits, in order to avoid generating a potentially discoverable paper trail of their misconduct. The Defendants also concealed from the general public their internal communications about their deceptive course of conduct, including their plans to hook more patients on higher doses for longer periods and, separately, their knowledge of inappropriate prescribing by high-prescribing doctors that they had targeted to prescribe their opioids.

367. Discovering the nature and extent of the Defendants' unfair and deceptive conduct has been a time-consuming and complex process, further strained by Defendants' lack of cooperation and baseless denials. Due to Defendants' deception, any statutes of limitation otherwise applicable to any claims asserted herein against all Defendants have been tolled by the discovery rule and rules regarding fraudulent concealment.

## INDIVIDUAL CAUSES OF ACTION

## INDIVIDUAL COUNT I- NEGLIGENCE

368. Plaintiffs reassert the allegations of the foregoing paragraphs as if set forth fully herein.

369. Defendants owe a non-delegable duty to Plaintiffs to conform their behavior to the legal standard of reasonable conduct under the circumstances, in the light of the apparent risks.

370. There is no social value to Defendants' challenged behavior. In fact, Defendants' entire conduct, behavior, actions, misrepresentations, conspiracies, and omissions are against the law.

371. On the other hand, there is immense social value to the interests threatened by Defendants' behavior, namely the health, safety, and welfare of Plaintiffs.

372. Defendants' behavior caused a substantial injury and damage to Plaintiffs.

373. Defendants' conduct fell below the reasonable standard of care and was negligent. Their negligent acts include:

   a. Consciously supplying the market in California with highly-addictive prescription

opioids, including misrepresenting, understating, or obfuscating the highly addictive propensities of opioid pills;

b.  Using unsafe marketing, labeling, distribution, and dispensing practices, including failing to warn or advise physicians to conduct an addiction family history of each and every potential patient;

c.  Affirmatively enhancing the risk of harm from prescription opioids by failing to act as a last line of defense against diversion;

d.  Failing to properly train or investigate their employees;

e.  Failing to properly review and analyze prescription orders and data for red flags;

f.  Failing to report suspicious orders or refuse to fill them;

g.  Failing to provide effective controls and procedures to detect and/or guard against theft and diversion of controlled substances;

h.  Failing to police the integrity of their supply chains; and

i.  Creating misleading information with the intention of having prescribing physicians rely upon it.

374.  The aforementioned conduct of Defendants proximately caused damage to Plaintiff.

## INDIVIDUAL COUNT II - PUNITIVE DAMAGES

375.  Plaintiffs reassert each and every allegation set forth in all preceding paragraphs as if fully restated herein.

376.  The conduct of Defendants as set forth herein was malicious, oppressive, willful, wanton, reckless, and/or criminally indifferent to civil obligations affecting the rights of others, including Plaintiffs.  Plaintiffs are thus entitled to recover punitive damages against Defendants.

377.  Defendants were malicious, oppressive, willful, wanton, reckless, and/or criminally indifferent to civil obligations affecting the rights of others, including Plaintiffs, in their activities and

90

in failing to warn Plaintiffs of dangers well known to Defendants, which acts exhibited a deliberate disregard for the rights and safety of Plaintiffs.

378.    Defendants realized the imminence of danger to Plaintiffs and other members of the public, but continued with deliberate disregard and complete indifference and lack of concern for the probable consequences of their acts.

379.    As a direct result of Defendants' deliberate disregard for the rights and safety of others, gross negligence, malicious, oppressive, willful, wanton, reckless, and/or criminal indifference to civil obligations affecting the rights of others, including Plaintiffs, Plaintiffs suffered the injuries and dangers stated above.

380.    Defendants' acts as described herein exhibited deliberate disregard for the rights and safety of others and were malicious, oppressive, willful, wanton, reckless, and/or criminally indifferent to civil obligations affecting the rights of others, including Plaintiffs.  An award of punitive and exemplary damages is therefore necessary to punish Defendants, and each of them, and to deter any reoccurrence of this intolerable conduct.  Consequently, Plaintiffs are entitled to an award of punitive damages.

381.    The conduct of Defendants as set forth herein was malicious, oppressive, willful, wanton, reckless, and/or criminally indifferent to civil obligations affecting the rights of others, including Plaintiffs. Plaintiffs are thus entitled to recover punitive damages against Defendants in an amount sufficient to punish Defendants for their wrongful conduct and to deter Defendants and others from similar wrongful conduct in the future.

INDIVIDUAL COUNT III – CIVIL CONSPIRACY

382.    Plaintiffs reassert the allegations in the foregoing paragraphs as if fully set out herein.

383.    All Defendants acted in concert to mislead medical professionals, patients, the scientific community, the CDC, the FDA the DEA and the general public about the addictive nature

of opioids and the risk of serious latent disease associated with in utero exposure to opioids so that their profits would increase.

384.    The Pharmaceutical Defendants continuously supplied prescription opioids to the Distributor Defendants despite having actual or constructive knowledge that said Distributors were habitually breaching their common law duties and violating the CSA. The Distributor Defendants continuously supplied prescription opioids to pharmacies despite having actual or constructive knowledge that said pharmacies were habitually breaching their common law duties and violating the CSA.

385.    Without the Distributor Defendants' supply of prescription opioids, pharmacies would not be able to fill and dispense the increasing number of prescription opioids throughout West Virginia.

386.    No Defendant in this opioid network would have succeeded in profiting so significantly from the opioid epidemic without the concerted conduct of the other party, and none would have succeeded so significantly without engaging in the wrongful conduct as herein alleged.

387.    The Pharmaceutical Defendants likewise benefitted from this distribution conspiracy in that the more pervasive opioid diversion became, the more the Pharmaceutical Defendants profited. Despite access to the same information in the hands of the Distributor Defendants, the Pharmaceutical Defendants ignored the warning signs of opioid diversion.

388.    This court has found that there is a genuine issue of material fact as to whether the Pharmaceutical Defendants had an agreement to commit an unlawful act, among themselves or with other Defendants in order to expand the market for prescription opioids, and that Pharmaceutical Defendants a reasonable jury could review the evidence presented and find that Distributor Defendants shared a general conspiratorial objective with themselves and other Defendants to expand the opioid market and disregard regulatory obligations in order to achieve that goal. *See* Order

Regarding Defendants' Summary Judgment Motions on Civil Conspiracy Claims, Case 1:17-md-02804-DAP, Doc #2562, Filed 09/03/2019.

389.    As a result of the concerted actions between and among the Defendants, Plaintiffs have suffered damages.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Rhonda Bernaby, as the next friend and guardian of Baby A.B request that the Court grant the following relief:

   a.   Individual Compensatory and Punitive damages for physical and mental pain and suffering (past and future);

   b.   Medical expenses (past and future)

   c.   Lost wages (past and future)

   d.   Loss of enjoyment of life (hedonic damages);

   e.   All other damages awarded at law or in equity; and

   f.   Plaintiffs seek a trial by jury for all counts so triable.

DATED:  October 02, 2020                     Respectfully submitted by:

                                             */s/Celeste Brustowicz*
                                             COOPER LAW FIRM
                                             Celeste Brustowicz
                                             Stephen Wussow
                                             1525 Religious Street
                                             New Orleans, Louisiana  70130
                                             Telephone:  504-399-0009
                                             Facsimile:  504-309-6989
                                             Email:  cbrustowicz@clfnola.com
                                             **TRIAL COUNSEL**

                                             */s/Scott R. Bickford*
                                             MARTZELL, BICKFORD & CENTOLA

Scott R. Bickford
Spencer R. Doody
338 Lafayette Street
New Orleans, Louisiana 70130
Telephone: 504-581-9065
Facsimile: 504-581-7635
Email:  srb@mbfirm.com
**TRIAL COUNSEL**

CREADORE LAW FIRM
Donald E. Creadore
450 Seventh Avenue, Suite 1408
New York, New York 10123
Telephone:  212-355-7200
Email:  donald@creadorelawfirm.com

THE LAW OFFICES OF KENT
HARRISON ROBBINS, P.A.
Kent Harrison Robbins
242 Northeast 27th Street
Miami, Florida 33137
Telephone: (305) 532-0500
Facsimile: (305) 531-0150
Email: khr@khrlawoffices.com
Secondary: ereyes@khrlawoffices.com
Tertiary: assistant@khrlawoffices.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 2nd day of October, 2020, a copy of the above and foregoing has been electronically filed with the Clerk of Court using the CM/ECF system, which provides an electronic service notification to all counsel of record registered as CM/ECF users.

_____

94